UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ADELPHIA COMMUNICATIONS CORP., et. al., | ) | Case No. 02-41729 (REG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| ADELPHIA RECOVERY TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| FPL GROUP, INC., et al., | ) | Adv. Pro. No. 04-03295 (REG) |
| | ) | |
| Defendants. | ) | |

DECISION AFTER TRIAL[1]

APPEARANCES:

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for Plaintiff Adelphia Recovery Trust
1633 Broadway
New York, New York 10019
By:     David M. Friedman, Esq. (argued)
        Michael C. Harwood, Esq.
        Howard W. Schub, Esq.
        Robert M. Novick, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Counsel for Defendants FPL Group, Inc. and West Boca Security, Inc.*
4 Times Square
New York, New York 10036
By:     George A. Zimmerman, Esq. (argued)
        Jonathan L. Frank, Esq.

---

[1]     Upon a motion to withdraw the reference, Judge Crotty of the district court determined that this action—one to recover an alleged fraudulent transfer—was beyond the Bankruptcy Court's final adjudicatory power. *Adelphia Recovery Trust v. FPL Group, Inc. (In re Adelphia Commc'ns Corp.)*, 2012 U.S. Dist. LEXIS 10804, *15, 2012 WL 264180, *5 (S.D.N.Y. Jan. 30, 2012) (ECF No. 71 in this Court's docket). But he determined that a bankruptcy judge could issue proposed findings of facts and conclusions of law in a fraudulent transfer action, *id.* at *16, 2012 WL 264180 at *6, and that "[t]he Bankruptcy Court should proceed with the reference, conduct the trial and issue proposed findings of fact and conclusions of law." *Id.* at *22–23, 2012 WL 264180 at *8.  My Findings of Fact and Conclusions of Law are accordingly only proposed.  But I've written this decision as I would any other decision after trial.

# TABLE OF CONTENTS

Introduction ........................................................................................................................ 1
Findings of Fact ................................................................................................................. 3
I. Background ..................................................................................................................... 3
  A. Adelphia/FPL Partnership ........................................................................................ 3
  B. FPL's Additional Adelphia Stock Acquisitions ....................................................... 5
II. Interdependence of Adelphia/FPL 1999 Transactions ................................................. 6
  A. Underlying Factual Findings re Interdependence ..................................................... 6
    1. The Letter Agreement .......................................................................................... 7
    2. Board Approval and Press Release ..................................................................... 11
    3. The Stock Repurchase ......................................................................................... 13
    4. The Olympus Redemption ................................................................................... 14
    5. FPL's SEC Filings .............................................................................................. 15
  B. My Factual Conclusions re Interdependence .......................................................... 16
III. Solvency, Capital Adequacy, & Equitable Insolvency .............................................. 16
  A. Solvency .................................................................................................................. 17
    1. The Experts' Analyses—Overview ..................................................................... 17
    2. The Experts' Methodologies ............................................................................... 18
      (a) Discounted Cash Flow .................................................................................. 18
      (b) Comparable Companies ............................................................................... 21
      (c) Precedent Transactions ................................................................................. 24
      (d) Adjustments to TEV ..................................................................................... 26
        (i) Verto Communications Acquisition ......................................................... 26
        (ii) Olympus Partnership Interest ................................................................. 27
        (iii) Interest in ABIZ .................................................................................... 29
        (iv) Receivables .......................................................................................... 29
        (v) Non-Cable Assets other than ABIZ ........................................................ 30
    3. Experts' Conclusions as to TEV After Adjustments .......................................... 30
    4. Experts' Analysis of Liabilities .......................................................................... 31
    5. Experts' Conclusions ........................................................................................... 31
    6. My Solvency Conclusions .................................................................................. 32
      (a) Methodology .................................................................................................. 32
      (b) Adjustments to Value ................................................................................... 39
        (i) Verto Communications ............................................................................ 39
        (ii) Olympus ................................................................................................. 40
        (iii) ABIZ ..................................................................................................... 41
        (iv) Rigas Family Entities ............................................................................ 41
        (v) Olympus ................................................................................................. 42
        (vi) Noncable Assets Other than ABIZ ......................................................... 42
      (c) Net Debt ........................................................................................................ 42
        (i) ABIZ Debt ............................................................................................... 42
        (ii) Repayment of Bank Debt ....................................................................... 43
       (d) My Finding re Solvency ............................................................................... 44
  B. Capital Adequacy .................................................................................................... 45
    1. Capital Needs ...................................................................................................... 45

(a) Subscriber Number ........................................................................................ 46
(b) Olympus Consolidation ................................................................................... 48
(c) Equity Issuance .............................................................................................. 49
(d) CapEx ............................................................................................................. 50
2. Access to Capital .............................................................................................. 52
(a) High Leverage Ratio ...................................................................................... 53
(b) Ability to Sell Assets ...................................................................................... 55
(c) Effect of Fraud on Access to New and Existing Sources of Capital ............ 56
3. My Capital Adequacy Conclusions .................................................................. 58
(a) Capital Needs ................................................................................................. 58
(b) Access to Capital Markets ............................................................................. 59
C. Equitable Insolvency ......................................................................................... 61
IV. Ultimate Findings of Fact ................................................................................... 61
Discussion ................................................................................................................. 62
I. Interdependence ..................................................................................................... 64
II. Insolvency ............................................................................................................. 73
III. Inadequate Capital and Equitable Insolvency .................................................... 74
Conclusion ................................................................................................................. 76

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

<u>Introduction</u>

In this adversary proceeding under the umbrella of the chapter 11 cases of reorganized

debtor Adelphia Communications Corporation ("**Adelphia**") and about 232 affiliates

(together, the "**Debtors**"), the Adelphia Recovery Trust (the "**Recovery Trust**")—which was

established under the Debtors' now-confirmed chapter 11 plan as a successor to Adelphia's

rights—seeks to recover, as a fraudulent transfer, approximately $150 million[2] from

defendants FPL Group, Inc. ("**FPL**") and FPL's affiliate Mayberry Investments Inc.

("**Mayberry**," and together with FPL, the "**FPL Defendants**").

The Recovery Trust seeks to recover the $150 million Adelphia paid in January 1999[3]

for the repurchase of Adelphia's own stock.[4]

---

[2]     The exact amount of the alleged fraudulent transfer for which recovery is sought was $149,213,130.
But the difference in amount isn't material.  For simplicity, I refer to the amount in issue as "**the
$150 million.**"

[3]     The $150 million payment was made about three months before Adelphia entered into the first of three
"co-borrowing" facilities under which Adelphia became liable to repay secured lending syndicates for
over $3 billion that went to or for the benefit of Adelphia's former management, John, Timothy,
Michael and James Rigas (the "**Rigases**"): the UCA/Hilton Head facility, put in place in May 1999; the
Century Cable Holdings facility, put in place in April 2000; and the Olympus facility, put in place in
September 2001.  *See Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns Corp.),*
365 B.R. 24, 32 n.2, 61 (Bankr. S.D.N.Y. 2007) ("***Adelphia-Bank of America***"), *aff'd as to all but an
unrelated issue*, 390 B.R. 80 (S.D.N.Y. 2008) (McKenna, J.).

Few would dispute that the co-borrowing facilities had a crushing effect on Adelphia's solvency.  This
adversary proceeding requires determination of the extent to which Adelphia became insolvent or was
left with inadequate capital before any of the co-borrowing facilities were put in place.

[4]     The stock in question was of two types.  One was Class A Common Stock (whose acquisition by FPL in
1995 is discussed at page 4 below), one of the two classes of common stock Adelphia had at the time.
There was no evidence in the trial record of this adversary proceeding as to this—and thus this isn't a
factual finding—but I note that the Second Circuit stated, in an opinion with respect to the Rigas
criminal trial, discussed below, *see* n.27, that Adelphia had issued two classes of common stock:  Class
A, with one vote per share, and Class B, with 10 votes per share.  The Class B common stock was
almost entirely owned by members of the Rigas family, which enabled them to maintain control of
Adelphia and its board of directors.  *See United States v. Rigas*, 490 F.3d 208, 212 (2d Cir. 2007)
("***Rigas Criminal Trial I***").

The other was Class C preferred stock (whose acquisition by FPL is discussed starting at page 6 below).

In another transaction that closed in October 1999, about eight months later, Adelphia affiliate Olympus made a second purchase from FPL, redeeming FPL's interest (the "**Olympus Partnership Interest**") in a joint venture partnership[5] between Olympus and FPL. Whether the first and second purchases were interdependent, on the one hand, or separate transactions, on the other, is disputed by the two sides.[6]

For the reasons that follow, I conclude that:

(1) the two transactions—Adelphia's January 1999 repurchase of its stock, and its October 1999 purchase of the Olympus Partnership Interest— were not interdependent, and Adelphia's purchase of its stock was indeed without consideration; but that

(2) at the time of the transaction, Adelphia was not yet insolvent, left with inadequate capital, or unable to pay its debts as they matured.

Accordingly, judgment should be entered in favor of the FPL Defendants.

---

But the type of stock that was repurchased doesn't matter for the purposes of this adversary proceeding, and for the most part I won't speak of the kind of stock with that level of detail.

[5] When two companies join together to conduct business, I typically refer to the entity by which they do so as a "joint venture," and save the word "partnership" for when individuals do so. But here, while various parties referred to their relationship in both ways, they more commonly spoke of it as a partnership, or simply "Olympus," and to avoid the confusion that would result from using both expressions, I'll use "partnership" throughout, except when quotations require the exact language then used.

[6] That might matter because if the two purchases were interdependent, any excess value received by Adelphia on its second purchase could be regarded as consideration to offset any value deficiency with respect to the first.

Findings of Fact[7]

I.

Background

The Adelphia-FPL relationship had its origin, and end, as a result of FPL's desires,
over a period of time, to enter, and then exit, businesses other than FPL's traditional business
of delivery of electrical power, historically provided under the name "Florida Power & Light."
Beginning in 1984, FPL sought to diversify its business lines to provide non-electric utilities,
such as cable television. FPL began acquiring cable television assets primarily through a
newly-formed, indirect, wholly-owned subsidiary, Telesat Cablevision, Inc. ("**Telesat**"). The
strategy wasn't very successful, and by 1993, about nine years later, FPL sought to dispose of
its cable television assets.

To that end, in 1994, FPL agreed to sell its Telesat subsidiary to Time Warner
Communications. As is standard for transactions of this character, the sale was subject to
Hart-Scott-Rodino antitrust review. But after months of failing to receive the necessary
regulatory approval, the transaction languished. FPL then considered other alternatives.

*A. Adelphia/FPL Partnership*

In 1995, FPL again sought to divest itself of its cable television assets—this time by
forming a partnership with Adelphia. By 1995, Adelphia was one of the largest operators of
cable systems in the U.S., and was already involved in the cable television industry in Florida.
Through a wholly-owned subsidiary, ACP Holdings, Inc. ("**ACP**"), Adelphia held a limited

---

[7]    To minimize the length of this decision, citations are limited to the most significant matters. From time
to time in this decision, I've made reference to my earlier decisions in the Adelphia chapter 11 cases to
provide context and useful background. *See, e.g.*, *Adelphia-Bank of America*, n.3 above; *In re Adelphia
Communications Corp.*, 368 B.R. 140, 148–153 (Bankr. S.D.N.Y. 2007) ("***Adelphia Confirmation***").
But I haven't made any findings here based on anything other than in the trial of this particular
adversary proceeding.

partnership interest in Olympus Communications, L.P. ("**Olympus**"), which owned various

cable properties in Florida.  Structuring the transaction as a partnership would relieve FPL of

management of the FPL Florida cable properties but wouldn't involve the antitrust review that

a sale would invoke.

Thus, in February 1995 (about four years before the $150 million stock buyback),

Adelphia, FPL, Adelphia subsidiary ACP, and FPL subsidiary Telesat entered into two

agreements to create what we now call the Olympus Partnership:  an Investment Agreement

("**Investment Agreement**") and a Second Amended and Restated Limited Partnership

Agreement (the "**Partnership Agreement**").

Under the Investment Agreement, among other things,[8] FPL subsidiary Telesat agreed

to:

> (1) contribute substantially all of its Florida cable television assets to
>
> Olympus;
>
> (2) purchase, for $15 million, a million shares of Adelphia common
>
> stock; and
>
> (3) provide a total of $20 million in loans to Olympus (the "**Telesat**
>
> **Olympus Loans**").

In exchange, FPL's Telesat would receive a one-third economic interest and 50% voting

interest in the Olympus Partnership.[9]

---

[8]     Here and elsewhere, I've left out detail that's unnecessary to this decision.

[9]     As a technical matter, Telesat would hold those interests through two of its wholly-owned subsidiaries,
Cable LP III, Inc. ("**Cable LP III**") and Cable GP Inc. ("**Cable GP**").  After its stock purchase, Telesat
would hold approximately 7% of Adelphia's common stock.  Thus the Investment Agreement further
provided that a Telesat nominee would be granted a seat on Adelphia's Board of Directors (the
"**Board**").  Dennis Coyle ("**Coyle**"), a former FPL General Counsel and Corporate Secretary (and
FPL's key fact witness at the trial), was nominated by Telesat, and Coyle served as an Adelphia director
beginning in September 1995.

-4-

Also under the Investment Agreement, Adelphia agreed to contribute to the Olympus Partnership, among other things, Adelphia's rights to purchase cable systems located in Palm Beach County Florida.  Adelphia held those rights under an October 1994 Asset Purchase Agreement (the "**West Boca Agreement**") that Adelphia had previously entered into with WB Cable Associates, Ltd. ("**WB Cable**").

Under the West Boca Agreement, Adelphia had the option to pay the seller up to $10 million of the purchase price using Adelphia common stock.  To allow Olympus to utilize this option after the assignment, Adelphia gave Olympus a non-interest bearing loan of $15 million due upon completion or termination of the West Boca Agreement.  Olympus could then use the proceeds of that loan to pay up to $10 million to Adelphia, in exchange for which Adelphia would issue an equivalent amount of shares of Adelphia's common stock to WB Cable.

*B.  FPL's Additional Adelphia Stock Acquisitions*

In October 1995 (about 10 months after Adelphia and FPL had joined in the Olympus Partnership), Olympus exercised the option under the West Boca Agreement to pay WB Cable using Adelphia common Stock.  As contemplated under the Investment Agreement, Olympus paid Adelphia for that stock, and Adelphia issued an equivalent amount of shares of Adelphia common stock to WB Cable.

WB Cable subsequently dissolved, leaving to its shareholders the Adelphia common Stock it had received.  But one of FPL's subsidiaries, Cable LP, held a 20% interest in WB Cable when WB Cable dissolved.  Thus FPL subsidiary Cable LP received 91,524 shares of Adelphia common stock.

In December, 1996, Telesat assigned the one million shares of Adelphia's common stock that it had purchased pursuant to the Investment Agreement to its wholly-owned subsidiary, Mayberry Investments Inc. ("**Mayberry**").

Then, in July 1997, Olympus repaid the $20 million in Telesat Olympus Loans that Telesat had made to Olympus under the Investment Agreement. Through a series of complex transactions designed to minimize tax consequences, Olympus repaid the loans by issuing 20,000 shares of Adelphia's Series C Preferred Stock (valued at $19.4 million) to Telesat, and paying the remaining $600,000 in cash. The Series C Preferred Stock was priced at $970 a share and was convertible into 2,356,490 shares of ACC common stock.

Thus, at the conclusion of these transactions, FPL's subsidiary Telesat held 1 million shares of Adelphia's common stock in its wholly-owned subsidiary, Mayberry; 91,524 shares of Adelphia's common stock in its wholly-owned subsidiary, Cable LP I; and 20,000 shares of Adelphia's Series C Preferred Stock directly.

## II.

### Interdependence of Adelphia/FPL 1999 Transactions

*A. Underlying Factual Findings re Interdependence*

After a little less than four years as joint venture partners together as members of the Olympus Partnership, FPL and Adelphia sought to end their relationship. Beginning in 1998, Adelphia and FPL underwent several months of negotiation, primarily between FPL CEO James Broadhead; FPL's Coyle; former Chairman of Telesat Leslie Gelber ("**Gelber**"); and members of the Rigas family—Timothy Rigas ("**Tim Rigas**") in particular.

At a lunch meeting in about October 1998 (the "**October Meeting**"), Coyle, Tim Rigas and Gelber discussed "a transaction in which FPL Group would fully exit the cable television business" involving liquidation of FPL's Adelphia stock and liquidation of FPL's

partnership interest in Olympus.[10]   According to Coyle, at the October Meeting, he "made it very clear to both Mr. [Tim] Rigas and Mr. Gelber that FPL Group viewed this as one transaction with two steps."[11]

After the October Meeting, the negotiations continued for several months, with Coyle primarily handling them insofar as they involved the repurchase of the Adelphia stock, and "people on the financial and tax side of FPL Group" handling the partnership interest redemption.[12]  On January 21, 1999, Adelphia and Telesat entered into a one-page letter agreement (the "**Letter Agreement**") summarizing their agreement, signed by Tim Rigas, on behalf of Adelphia, and Coyle, on behalf of Telesat.[13]

   *1. The Letter Agreement*

The Letter Agreement had two separate sections.  The first section was entitled "Sale of Stock."  It began by summarizing Telesat's current holdings of Adelphia's stock—common and preferred.  The Letter Agreement stated, by way of background:

> Telesat indirectly owns 1,091,524 shares of Adelphia common stock and Adelphia preferred stock convertible into 2,358,490.57 shares of Adelphia common stock, which equates to a total of 3,450,014 shares of Adelphia common stock.

It then described an agreement under which Adelphia would repurchase all of Telesat's holdings of Adelphia stock (the "**Stock Repurchase**"):

> Subject to the approval of the Board of Directors of Adelphia, Adelphia will purchase all of these shares at price of $43.25 per share of Adelphia common stock, which equates to a total of $149,213,130.  (The fractional share issuable upon conversion of the

---

[10]    Declaration of Dennis P. Coyle ¶ 21, Apr. 18, 2012, ECF No. 109 ("**Coyle Decl.**").

[11]    *Id.*

[12]    *Id.* ¶¶ 23–24.

[13]    Letter Agreement (Jan. 21, 1999) (Joint Exh. 4).

> preferred stock will be paid in cash).  This transaction
> will occur upon execution of normal and customary
> documentation for a transaction of this type, which the
> parties expect will occur on or about January 27, 1999.

The price for the Stock Repurchase was based on the price at which shares were to be

offered to the public with an underwriting discount.[14]  The Stock Repurchase was "subject to"

Adelphia's Board's approval, and stated that it "will occur" upon the execution of formal

documents to consummate the transaction.  But the Letter Agreement had no provisions

expressly stating whether or not the parties were contractually binding themselves before

those conditions were satisfied.

The Letter Agreement then continued with a second, separate, section entitled

"Redemption of Olympus Partnership Interest."  The second section addressed Telesat's

partial or total exit from the Olympus Partnership (the "**Redemption**"), and specified the

value that would underlie the price of the Redemption.  After stating that "Telesat indirectly

owns partnership interests in Olympus Communications, L.P.," it continued:

> Olympus will partially or totally redeem Telesat's
> interest at a price based on a value of $108,000,000 for
> Telesat's interest.

But unlike the Stock Repurchase, the Redemption was not scheduled to occur

immediately.  And the terms of the Redemption were not then finalized.[15]  The Letter

Agreement allowed for the possibility that a partial—rather than total—redemption might

occur if the parties could agree upon mutually satisfactory terms.  In that connection, the

Letter Agreement stated:

---

[14]    Coyle Decl. ¶ 23.

[15]    *See* FPL Group Annual Report (Form 10-K) (Mar. 2, 1999) at PX 033-054 (Plaintiff's Exh. 33) ("**FPL 1998 Form 10-K**") ("While the terms have not been finalized, the sale of the limited partnership interest is expected to have a positive effect on FPL Group's results of operations").

> Telesat shall have until July 11, 1999, to present a plan
> of partial redemption to Adelphia for Adelphia's
> approval.  Adelphia will use its reasonable business
> judgment in evaluating any plan submitted by Telesat.

But if the parties could not agree on the terms of a partial redemption, a full Redemption

would occur as a backstop:

> If Adelphia and Telesat cannot agree on a plan of partial
> redemption on or before July 11, 1999, then Olympus
> shall totally redeem Telesat's interest at the price agreed
> to above.  This transaction shall occur as soon as
> practicable after there is a failure to reach agreement on
> a plan of partial redemption within the time period
> specified.

According to Coyle, the partial Redemption option was proposed by FPL because of "several

concerns relating to tax considerations surrounding the transaction" and the desire to "build

into its agreement the flexibility to structure the redemption in accordance with such tax

considerations."[16]   But (once more according to Coyle) "[t]his flexibility did not change the

intent of FPL Group to fully exit the cable television business and by extension, Olympus."[17]

Like the Stock Repurchase, the Redemption section of the Letter Agreement contained no

express provisions addressing whether or not the parties then were contractually bound.

The Letter Agreement further provided for FPL's execution of a power of attorney in

favor of Olympus; if Telesat and Adelphia were unable to agree upon the terms of a partial

redemption, the full Redemption could occur with no further action.  In that connection, the

Letter Agreement stated:

> Simultaneously with the execution of the documentation
> for the purchase of the Adelphia shares or thereafter
> from time to time, the parties will execute a power of
> attorney in favor of, or other documentation reasonably

---

[16]    Coyle Decl. ¶ 29.

[17]    *Id.*

> requested by, Olympus so that Olympus may
> consummate the redemption without any further action
> on the part of Telesat.

Finally, the Letter Agreement stated:

> The Telesat transaction is subject to any applicable
> approvals of third parties, including governmental
> authorities and including Hart-Scott-Rodino approval.[18]

Coyle testified that at the time he understood this provision to be "simply a boilerplate

provision" as he believed that "there was no chance that this transaction would not be

consummated because of any [Hart-Scott-Rodino] Act issues."[19]

Importantly, the Letter Agreement contained no language suggesting that the Stock

Repurchase and the Redemption were conditioned upon one another.  In self-serving

testimony during the trial that I found unpersuasive and am unwilling to credit, Coyle claimed

that he "would not have agreed to do one step [of the transaction] without the other."[20]  But

that is inconsistent with the documentary record and his testimony elsewhere, discussed

below.  Nothing in the Letter Agreement made the transactions contingent upon one another.

The Letter Agreement did not provide that if the Redemption failed to occur (e.g., for failure

to obtain regulatory approval) or was only partial, the Stock Repurchase (which would have

taken place substantially earlier) would be unwound.  And neither transaction was reliant

upon the other for its terms.  The purchase price for the Redemption in no way related to the

price for the Stock Repurchase, or vice versa.  Each transaction could have occurred on its

own, and indeed, each was set to occur on its own, independently, and at different times.

---

[18]    The "Telesat transaction" as used in this paragraph was not a defined term and the Letter Agreement
nowhere made clear what the term "Telesat transaction" meant.

[19]    Coyle Decl. ¶ 30.

[20]    Coyle Decl. ¶ 26; Trial Tr. vol. 6, 685:5–13, May 2, 2012, ECF No. 117 ("**Trial Tr. Vol. 6**").

-10-

2. *Board Approval and Press Release*

On January 27, 1999, Tim Rigas presented the Letter Agreement to the Board.[21]

According to minutes of that meeting,[22] Tim Rigas first "explained that the Company had

reached a letter agreement with Telesat Cablevision, Inc. regarding the repurchase of the

Company's stock held by Telesat and its subsidiaries, and regarding the eventual redemption

of the interests held by Telesat in Olympus Communications, L.P., the joint venture

partnership in Florida."[23]  He then described the provisions of the Letter Agreement in

detail.[24]  Tim Rigas specified that the Redemption "part of the transaction will be subject to

any necessary third party approvals and governmental approvals."[25]

The Board Minutes are ambiguous as to whether the Board voted on each of the Stock

Repurchase and the Redemption separately.[26]  At the Rigas criminal trial,[27] Coyle, who

---

[21]     Adelphia Board Minutes (Jan. 27, 1999) (Def. Exh. 2) ("**Board Minutes**").

[22]     In other proceedings in the *Adelphia* chapter 11 case, I doubted the veracity of the Rigases' corporate
resolutions and minutes, particularly those prepared by former Adelphia employee Colin Higgin (an
aide to Tim Rigas, who signed these minutes as Assistant Secretary), whose accounts I previously found
to be "generally unworthy of belief."  *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns
Corp.)*, 323 B.R. 345, 363 (Bankr. S.D.N.Y. 2005).  But for lack of evidence to the contrary in this
adversary proceeding, and because independent Adelphia directors are reported to have been present at
the meeting, I accept the corporate minutes as true.

[23]     Board Minutes at DX 002-002.

[24]     *Id.*

[25]     *Id.*

[26]     *Id.* at DX 002-003.  Specifically, with regard to the voting procedures, the Board Minutes state:

> After full discussion and the answering of all questions, upon
> motion duly made by Pete Metros and seconded by Perry Patterson,
> the following resolutions were unanimously adopted by the full
> board and separately by all the independent directors present, in
> each case with Dennis Coyle expressly abstaining on the vote.

The resolutions identified in the preceding paragraph included both the Stock Repurchase and the
Redemption.

[27]     John, Timothy and Michael Rigas (along with two lower-level Adelphia employees) were indicted on
multiple counts of securities fraud, wire fraud, bank fraud and criminal conspiracy in connection with
their management of Adelphia.  After a trial (at which Coyle testified), a jury convicted John and Tim
Rigas of conspiracy, bank fraud and securities fraud, though it acquitted them of wire fraud.  Michael
Rigas was acquitted of conspiracy and wire fraud, but the jury deadlocked on the other counts.  He later

-11-

participated in the Board Meeting telephonically but recused himself from voting due to his

conflict of interest, described the two transactions as "separate," and that he "needed to

abstain from voting on both transactions."[28]  But during the course of the trial of this

adversary proceeding, Coyle testified that there had only been one vote.[29]  In either case, at

---

pleaded guilty to a lesser charge of making a false entry in Adelphia's books and records.  *See United States v. Rigas*, 583 F.3d 108, 112 (2d Cir. 2009) ("***Rigas Criminal Trial II***").  For more detailed background with respect to the Adelphia criminal case, *see Rigas Criminal Trial I*, 490 F.3d at 212–19.

[28]   Rigas Criminal Trial Transcript at 1618, 1620, *United States v. Rigas, et al*, No. 02-CR-1236 (S.D.N.Y. Mar. 10, 2004) (Sand, J.).  The testimony in relevant part was as follows:

> Q:  Now, I think you testified the reason you abstained was there was a vote on the unwinding of the Olympus joint venture, correct?
>
> A:  I think at this meeting, the specific transaction was the sale of the common stock that we had and the series C convertible preferred stock.  That was the transaction.
>
> Q:  In connection with the unwinding of the joint venture, correct?
>
> A:  That's a separate transaction.  There were two pieces to this.  One is – that's a separate transaction.
>
> . . .
>
> Q:  And they stood to benefit because Adelphia would have to buy them out to unwind the joint venture, correct?
>
> A:  They didn't have to do anything.
>
> Q:  That's what they were proposing, correct?
>
> A:  That was the transaction that was being proposed.
>
> Q:  Now, you talked about this somewhat, but I'd like to delve into it just a little bit.  What were your positions –
>
> A:  Well, let me go back.  That was one of the transactions that was being proposed.
>
> Q:  Fine.
>
> A:  And it wasn't final yet.  The other transaction that was final was the sale of the stock.  So I needed to abstain from voting on both transactions.

[29]   Coyle Decl. ¶ 34.  With respect to this discrepancy, FPL explains, "[Coyle] had not reviewed the Board minutes in connection with the criminal trial (this was not an anticipated topic of his testimony) and had mistakenly thought that there was a separate vote taken on the Stock Repurchase and Olympus Redemption.  Based on that incorrect recollection, Mr. Coyle testified that, in the context of a conflict of interest inquiry, he recused himself from what he thought had been two separate votes.  However, as reflected in the Board Minutes, in fact, the ACC Board only took one vote at the one meeting approving both steps of 'the Telesat transaction.'"  Def.'s Post-Trial Br. 55 n.32, June 22, 2012, ECF No. 133 ("**FPL Post-Trial Br.**").  I think that the Board minutes are likely more accurate than Coyle's recollection of the resolutions that were before the Board, and accept the Board Minutes as indicative of

the conclusion of the meeting, the Board adopted resolutions (the "**Board Resolutions**")

authorizing, ratifying and approving the Letter Agreement and the steps necessary for the

execution of the Letter Agreement.[30]

On the day following the Board's approval, January 28, 1999, Adelphia issued a press

release disclosing the substance of the Letter Agreement.  The press release stated:

> Adelphia has reached an agreement to repurchase the
> Adelphia stock owned by Telesat Cablevision, Inc., a
> subsidiary of FPL, Inc. (NYSE [unreadable text, but
> probably a ticker symbol]) and to acquire the interests
> held by Telesat in Adelphia's joint venture partnership,
> Olympus Communications, L.P.[31]

It then stated "[t]he aggregate purchase price for these transactions will be

approximately $257,213,000."[32]

### 3.  The Stock Repurchase

On January 28, 1999, the same day that the Board issued the press release, Mayberry

and Adelphia entered into a Stock Purchase Agreement (the "**Stock Purchase Agreement**")

under which Mayberry agreed to sell to Adelphia all of Telesat's shares of Adelphia common

stock and Class C Convertible Preferred Stock for a purchase price of $149,213,130.[33]  The

Stock Purchase Agreement, which ran six pages before its signature page, was the epitome of

a definitive agreement, as contrasted to the Letter Agreement and other "preliminary

agreement[s]" as that expression is used in New York[34] and federal[35] caselaw dealing with

---

what technically happened.  But if Coyle regarded the two transactions as separate, I think that's
probative of *his* understanding, which cannot be disregarded.

[30]    Board Minutes at DX 002-003–DX 002-004.

[31]    Adelphia Press Release (Jan. 28, 1999) (Def.'s Exh. 3).

[32]    *Id.*

[33]    Mayberry Stock Purchase Agreement (Jan. 28, 1999) (Joint Exh. 5).

[34]    *See, e.g., IDT Corp. v. Tyco Grp., S.A.R.L.,* 918 N.E.2d 913, 915 n.2, 13 N.Y.3d 209, 213 n.2, 890
N.Y.S.2d 401, 403 n.2 (2009) (in determining whether the document in a given case is an enforceable

whether parties are contractually bound before definitive agreements are executed.
Importantly, the Stock Purchase Agreement made no reference to the Redemption of Telesat's interest in Olympus and was in no way contingent upon the Redemption.  It did not, however, contain a "merger clause" indicating that it represented a complete agreement, superseding all previous agreements.

On the same day—January 28, 1999, *i.e.*, the date of the alleged fraudulent transfer— Adelphia wire transferred the stock purchase price from its bank account into Mayberry's bank account.  On the following day, January 29, 1999, Adelphia received the stock certificates representing the repurchased shares from Mayberry.

### 4. The Olympus Redemption

In late May 1999, approximately four months after the Letter Agreement was signed, each of Telesat and several of Telesat's affiliates executed a power of attorney (the "**Powers of Attorney**") authorizing Adelphia and Olympus to redeem and retire Telesat's indirectly-owned partnership interests in Olympus, which would become effective on July 11, 1999 unless the parties earlier agreed to a partial redemption.[36]  But by that date, Telesat hadn't presented a plan of partial redemption to Adelphia.  The Letter Agreement had specified that if Adelphia and Telesat didn't agree upon a plan of partial Redemption by July 11, 1999, the full Redemption "transaction shall occur as soon as practicable."  Nevertheless, Olympus

---

contract or not, the question should be asked in terms of "whether the agreement contemplated the negotiation of later agreements and if the consummation of those agreements was a precondition to a party's performance.").

[35]    *See, e.g., Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir. 1984), *cert. denied*, 469 U.S. 828 (1984) ("agreement in principle" was not a binding agreement; documents and testimony showed intent of both parties not to be bound prior to execution of formal, written contract); *Teachers Ins. & Annuity Ass'n of America v. Tribune Co.*, 670 F.Supp. 491, 499–500 (S.D.N.Y. 1987) (Leval, J., then a district judge) (finding triable issue as to whether parties intended to be bound, when commitment letter was subject to various contingencies, including board approval, but stated that upon execution, it would be a "binding agreement").

[36]    Powers of Attorney (May 28, 1999) (Joint Exh. 6 at 13–24).

-14-

didn't immediately redeem Telesat's partnership interests.  Instead, the parties engaged in lengthy negotiations regarding the terms and structure of the Redemption.[37]

Finally, on October 1, 1999, *over eight months after* the Stock Repurchase had been consummated, Olympus and FPL's Cable GP entered into a redemption agreement (the "**Redemption Agreement**") by which Olympus agreed to redeem Telesat's entire partnership interest, for $108 million, through a complex series of transactions, the details of which, for the most part,[38] are immaterial to the underlying issues here.

*5. FPL's SEC Filings*

In early March 1999—about a month after the Stock Repurchase and about seven months before the Olympus Redemption—FPL filed its 10-K for the 1998 fiscal year with the SEC.[39]  The 10-K described the Stock Repurchase and the Olympus Redemption as *separate transactions*, and noted that the terms of the Redemption had not yet been finalized:

> In January 1999, an FPL Group Capital subsidiary sold 3.5 million common shares of Adelphia Communications Corporation (Adelphia) stock, which had been accounted for on the equity method, resulting in an after-tax gain of approximately $96 million.  *In addition,* an agreement was reached with Adelphia to sell FPL Group Capital's one-third interest in a limited partnership.  *While the terms have not been finalized,* the sale of the limited partnership interest is expected to have a positive effect on FPL Group's results of operations.[40]

---

[37]    Coyle Decl. ¶ 39.

[38]    The one exception is that as part of that transaction, a new corporation, West Boca Security Inc. ("**West Boca**") was formed, initially as a subsidiary of Olympus.  As part of the series of transactions relating to the Redemption (but, I find, without any connection to the Stock Repurchase), West Boca became a wholly-owned subsidiary of FPL's subsidiary Cable GP.  In September 2000, Cable GP, Telesat and Mayberry were merged into West Boca.  West Boca is named as a defendant in this litigation along with its indirect parent FPL.

[39]    FPL 1998 Form 10-K.

[40]    *Id.* at PX 033-054 (emphasis added).

Then, about a year later, in March 2000, FPL filed its 10-K for the 1999 fiscal year.[41]

The 10-K noted FPL's after-tax gains from the Stock Repurchase and the Redemption

separately:

> In January 1999, an FPL Group Capital subsidiary sold
> 3.5 million common shares of Adelphia
> Communications Corporation (Adelphia) stock and in
> October 1999 had its one-third ownership interest in a
> cable limited partnership redeemed, resulting in after-tax
> gains of approximately $96 million and $66 million,
> respectively.  Both investments had been accounted for
> on the equity method.[42]

Neither disclosure, to state the obvious, described the transactions as unified or

interdependent.

*B.  My Factual Conclusions re Interdependence*

The interdependence of the Stock Repurchase, on the one hand, and the subsequent

Redemption, on the other, is in my view a mixed question of fact and law.  For reasons set

forth above and in the Discussion below (applying the law to the underlying facts discussed

above), I conclude that the Stock Repurchase and the Redemption, while having a common

origin and similar motivation, were not interdependent or components of a single transaction.

## III.

## Solvency, Capital Adequacy, & Equitable Insolvency

While the interdependence issue addressed in Section II affects the extent to which

Adelphia received *any* value in the totality of its 1999 dealings with FPL—remembering, of

course, that, as the Recovery Trust notes and FPL understandably does not dispute,

Adelphia's buyback of its own stock, by itself, provided it with *no* value—I still need to

---

[41]    FPL Group Annual Report (Form 10-K) (Mar. 2, 2000) (Plaintiff's Exh. 34) ("**FPL 1999 Form 10-K"**).

[42]    FPL 1999 Form 10-K at PX 034-032.

engage in the traditional fraudulent transfer analysis to determine the extent to which

Adelphia was insolvent (or rendered insolvent), left with inadequate capital, or rendered

equitably insolvent at the time it paid out the $150 million the Recovery Trust now seeks to

recover.  My Findings of Fact in connection with these latter issues follow.

## A.

### Solvency

*1. The Experts' Analyses—Overview*

The Recovery Trust and FPL each offered expert opinions as to Adelphia's solvency at

the time of the Stock Repurchase, reflected first in expert reports each prepared, and then in

testimony before me.[43]  The Recovery Trust's primary solvency expert, Israel Shaked

(**"Shaked"**), of the Michel-Shaked Group, opined that at the time of the Stock Repurchase,

Adelphia was insolvent by approximately $1 billion.[44]  By contrast, FPL's primary solvency

expert, Ralph Tuliano (**"Tuliano"**), of Mesirow Financial Consulting, opined that Adelphia

was solvent, having a positive equity cushion of roughly $3.7 billion.[45]

---

[43]   I took the testimony as I did in earlier valuation trials before me—in *Global Crossing*, the *Adelphia* confirmation hearing, *DBSD* and *Chemtura*.  The testimony, consistent with my Case Management Order # 3 (Umbrella Case ECF # 5622) and my historic practice in cases where the evidence is heavily historic, numeric, and/or technical, was heard by declaration on direct, and live on cross, redirect, and anything thereafter.  Each expert witness made reference to his firm's expert report (or reports) in his testimony, with the Recovery Trust incorporating its reports by reference in direct testimony and FPL referring to its report in and appending it to its expert's direct testimony declaration.  *See* Direct Trial Test. Decl. of Professor Israel Shaked ¶ 3, Apr. 17, 2012, ECF No. 102 ("**Shaked Decl.**"); Decl. of Ralph S. Tuliano ¶¶ 3–4 & App. A, Apr. 17, 2012, ECF No. 108 ("**Tuliano Decl.**"), and in many other places.  The direct testimony came in without objection, and the expert reports were also offered into evidence, without objection.  Though the expert reports themselves may technically have been hearsay, I wasn't asked to rule on whether they were, or otherwise to rule that the expert reports were inappropriate for consideration after the various parties' opportunities to cross-examine the witnesses.  And as both sides relied on testimony and the expert reports essentially interchangeably, I'll do likewise.

[44]   Shaked Decl. ¶ 111.

[45]   Tuliano Decl. 26 tbl.2.

As is customary in valuation disputes, each expert opined as to the total enterprise value ("**TEV**") of Adelphia at the time of the transfer in question. The analysis by each of TEV led to a conclusion as to the value of the Debtors' assets from which their liabilities (which, as a general matter, are more easily ascertainable) could be subtracted.

But while Shaked and Tuliano each employed at least one of the standard valuation methodologies, neither used all of them. Shaked used only Discounted Cash Flow ("**DCF**") methodology, and Tuliano used only Comparable Companies and Precedent Transactions methodology, in each case as discussed below.

For reasons discussed below, I find that reliance—and especially sole reliance—on DCF was inappropriate under the facts of this case, and that for that reason, among others, Tuliano's analysis was generally more persuasive.

### 2. The Experts' Methodologies

#### (a) Discounted Cash Flow

DCF methodology estimates the net present value of a company by adding together the present value of two assumed future cash flow streams:

(1) projected unlevered cash flows for a number of upcoming years, discounted to present value using an estimated discount rate based upon the company's weighted average cost of capital ("**WACC**"); and

(2) projected cash flow for the period thereafter in perpetuity—often called the "terminal" or "exit" value.[46]

Shaked, but not Tuliano, employed DCF analysis, which is a very common element of any determination of TEV.

---

[46]    *See In re Chemtura Corp.*, 439 B.R. 561, 574 (Bankr. S.D.N.Y. 2010) (Gerber, J.) ("***Chemtura***").

But here both experts encountered difficulty using DCF analysis due to the lack of accurate and reliable management projections. For this reason, Tuliano declined to perform a DCF analysis.[47] And though Shaked utilized the methodology, he declined to use management projections—both because of their unavailability and because "any management projections that would have existed would have been based on fraudulent information, and would therefore be unreliable."[48] Likewise, Shaked declined to use any third-party industry analyst projections because they would have been based on Adelphia's inaccurately reported information.[49] Instead, to provide the basis for his valuation, Shaked developed his own projections of Adelphia's cash flow for the following ten years.

To create his own cash flow projections, Shaked first developed assumptions as to factors that would drive Adelphia's cash flow for the upcoming years, such as penetration rates, growth rates, revenue per subscriber, EBIDTA margins, and capital expenditures ("**CapEx**").[50] In doing so, Shaked consulted contemporaneous reports by third-party analysts Paul Kagan Associates ("**Kagan**") and Donaldson Lufkin Jenrette ("**DLJ**").[51] Shaked then applied his assumptions to make his own cash flow projections for ten years, before discounting them to their present value.

---

[47] Tuliano Decl. ¶ 43 ("I considered preparing financial projections for Adelphia but did not have the necessary reliable data and deemed this process to be speculative."). Tuliano critiqued and made numerous "corrections" to Shaked's DCF analysis, Tuliano Decl. ¶¶ 72, 75–95, exh. 1 at 15, but did not pursue a wholly independent analysis, which would have required relying on data other than Shaked's troublesome projections. *Id.* For this reason, it is fair to say that Tuliano did not use DCF methodology as part of his valuation.

[48] Shaked Decl. ¶ 40.

[49] *Id.*

[50] *Id.* ¶¶ 41–42.

[51] *Id.*

-19-

Shaked applied a discount rate of 15.08%, which he estimated to be Adelphia's WACC.[52]  To arrive at that WACC, Shaked assumed that "both lenders and shareholders require a higher rate of return on their investment in a fraud-plagued company than in a company that is law abiding."[53]  Shaked quantified the risk premium he thought investors would apply by consulting industry reports and academic research regarding the increased cost of capital for firms that had lower credit ratings or that had experienced fraud.[54]  Shaked assumed a debt risk premium of 6.79% and an equity risk premium of 3.95%, which together led to his WACC.[55]

Finally, Shaked calculated the terminal value using the perpetuity method.  Shaked declined to calculate terminal value based on a multiple of final year EBITDA, which is commonly done as part of DCF methodology, because he believed that doing so would introduce market-based analyses into his non-market based methodology.[56]  Instead, Shaked assumed that after the ten years of his projections, Adelphia would continue to grow in perpetuity at a rate of approximately 4%, taking into account inflation of approximately 3% and projected subscriber growth of less than 1%.[57]

After adding together the present value of projected cash flows for ten years and the terminal value he calculated, Shaked concluded that Adelphia had a TEV of $2.538 billion before any adjustments.[58]

---

[52]    Expert Report of Professor Israel Shaked ¶ 183, exh. 9, June 23, 2011 (Joint Exh. 60) ("**Shaked Rept.**").

[53]    Shaked Rept. ¶ 260.

[54]    *Id.* ¶¶ 184–87, 200.

[55]    *Id.* ¶¶ 188, 200.

[56]    *Id.* ¶ 203.

[57]    *Id.* ¶¶ 206–10.

[58]    Shaked Decl. ¶ 99.

### (b)  Comparable Companies

"**Comparable Companies**" analysis is another standard valuation methodology.  As a general matter, it estimates the value of a firm by first examining the value of comparable peer firms, and then using their metrics to project the value of the subject company.[59]  Values may be ascertained using one or more common metrics (such as revenue, earnings, or any other common metric that drives cash flow), with the expert then applying a multiple of the financial metric or metrics that yields the market's valuation of these comparable companies.[60]  A valuation metric in the cable industry, "**Value per Subscriber**"(which as its name implies, divides the comparable company's value by the reported number of subscribers, and which can then be used to value the subject company once the number of the subject company's subscribers is known) is commonly used in cable industry Comparable Companies valuations.

But only Tuliano performed a Comparable Companies analysis.  Shaked declined to use this methodology because, in his view, it required "a measure of historical or forward earnings for the subject company and the comparable companies" but data of this character was unavailable due to "misstatements of Adelphia's financial performance and the unavailability of reliable data for Adelphia and comparable companies for the time period at issue."[61]

Tuliano (the expert who did perform a Comparable Companies analysis) selected six guideline comparable companies:  Comcast Corporation; Cox Communications, Inc.; Cablevision Systems Corporation; Century Communications Corporation; Jones Intercable,

---

[59]      Tuliano Decl. ¶ 47.

[60]      *See* Tuliano Decl. ¶ 47; *Chemtura*, 561 B.R. at 575.

[61]      Shaked Decl. ¶ 89.

Inc. and TCA Cable TV, Inc.[62]  Tuliano used only the Cable components of the comparable

companies to derive multiples, since several derived a portion of their value from assets other

than Cable.[63]

Tuliano then calculated the TEV of each of the guideline companies.  He calculated

TEV by combining the market value of equity and debt interests in the company, excluding

cash and equity investments.[64]  Tuliano then employed a Value per Subscriber analysis; he

divided each company's TEV by its reported number of subscribers to yield each company's

"multiple"—i.e., value per subscriber.[65]  His Value per Subscriber multiples ranged between

$2,462 and $3,835.[66]

Tuliano used only the Value per Subscriber multiple, because it "is commonly used in

the cable industry and provides a highly reliable indication of the value of Adelphia's cable

business."[67]  Shaked criticized the use of a subscriber multiple because it "[did] not account

for the differences between companies relating to upgrade status and profitability" and

because Adelphia appeared to generate less revenue per subscriber than its competitors.[68]

Accordingly, Shaked did not use Value per Subscriber analysis at all.  But Shaked agreed that

value per subscriber is widely and appropriately used in valuing cable systems.[69]

---

[62]     Tuliano Decl. ¶ 48.

[63]     *Id.* ¶ 49.

[64]     *Id.* ¶ 49 & n.51.

[65]     *Id.* ¶ 49, exh. 1 at 2.

[66]     *Id.* 19 fig.2, exh. 1 at 2.

[67]     *Id.* ¶ 49.

[68]     Shaked Decl. ¶¶ 116–118.

[69]     Trial Tr. vol. 3, 236:4–238:23, May 1, 2012, ECF No. 114 ("**Trial Tr. Vol. 3**").  In the trial before me, Shaked agreed that a report he prepared for litigation by the Recovery Trust against Bank of America and other co-borrowing facility lenders, *see Adelphia-Bank of America*, n.3 above, was accurate when he stated:

Tuliano then qualitatively compared Adelphia with the guideline companies to determine what multiple to select within the range of Comparable Company Value per Subscriber multiples.[70] Based, in part, on Adelphia's relative upgrade status compared to the guideline companies, Tuliano selected $3,024 as the multiple that he would apply to Adelphia.[71] The multiple reflected the lowest quartile multiple.[72]

Next, Tuliano applied the selected multiple of $3,024 to the corrected number of subscribers based on audit summaries created during Adelphia's restatement[73] of its financial

---

The use of subscriber multiples was especially helpful in the cable industry because of the number of deals involving private cable systems or portions of larger cable systems. In both instances, detailed financial information about the systems was not available; however, the number of subscribers being acquired was always known, making it a simple metric that could be used universally to value cable acquisitions.

Trial Tr. Vol. 3 238:13–21 (quoting from Shaked's *Adelphia-Bank of America* report).

[70] Tuliano Decl. ¶ 53.

[71] Tuliano Decl. ¶ 53, 19 fig.3, exh. 1 at 2.

[72] Tuliano Decl. 19 fig.3, exh. 1 at 2.

[73] In March 2002, Adelphia disclosed that it had over $2 billion in additional debt, not reported on its consolidated financial statements, as a consequence of the co-borrowing facilities. Thereafter, independent members of Adelphia's Board created a special committee to investigate related party transactions between Adelphia entities and the Rigases. *See* Press Release (Joint Exh. 74 at 12).

After Adelphia filed for chapter 11 protection, Adelphia initiated a forensic accounting investigation using the accounting firm of Tatum CFO Partners, LLP ("**Tatum**"). In a massive undertaking, Tatum re-audited and restated Adelphia's financial statements for 1999 and 2000 and prepared financial statements for 2001, 2002 and 2003 after reviewing the many intercompany transactions that had not been properly recorded. PricewaterhouseCoopers LLP ("**PwC**") then audited the Debtor's consolidated financial statements, and after PwC found the restated consolidated financials to be highly reliable, I (at time of Adelphia's confirmation hearing) did too. *See Adelphia-Confirmation*, 368 B.R. at 151. I did not receive independent evidence in this adversary proceeding of the accuracy of Adelphia's restated financial information, but both sides here agreed, on the record, that the restatement process was well done, and that Adelphia's restated financial information was reliable. *See* Joint Pre-Trial Order ¶ 51, Apr. 6, 2012, ECF No. 94 ("**Joint Pre-Trial Order**"); *see also* Trial Tr. vol. 1, 6:25–7:25, April 30, 2012, ECF No. 112 ("**Trial Tr. Vol. 1**") (Friedman: "In other words, I think the parties all agree that the restatement is reliable and . . . if I'm not mistaken, one of the stipulated facts is that the restatement was reliable."; Zimmerman: "We basically agree. The findings you made previously about the thoroughness and excellence of the restatement process, I think both parties agree with that.").

statements.[74]  Tuliano calculated the value of Adelphia's cable assets on a marketable,

minority, basis to be $4.472 billion.[75]

Tuliano then added a control premium of 25%,[76] distinguishing between a controlling

and minority interest in Adelphia.[77]  Since Tuliano's valuation depended in part on the

comparable companies' stock prices (which were used to determine TEV for the comparable

companies), Tuliano determined that it was appropriate to add a control premium, because the

stock prices of publicly traded securities reflect minority interests, and here there was a

controlling interest.[78]  After adding the control premium (of $376.4 million), Tuliano

concluded, based on his Comparable Companies analysis, that Adelphia's assets were worth

$4.848 billion on the date of the Stock Repurchase before any adjustments.[79]  To that, he

added Adelphia's cash of $156.1 million, to yield a TEV of $5.004 billion before

adjustments.[80]

*(c)  Precedent Transactions*

Like Comparable Companies methodology, "**Precedent Transactions**" methodology

applies multiples derived from comparable companies—except that Precedent Transaction

methodology derives the value of comparable companies from their purchase prices in past

---

[74]     Tuliano Decl. ¶¶ 53–54, exh. 1 at 2 & n.5.

[75]     Tuliano Decl. ¶ 54, exh. 1 at 2.

[76]     Tuliano Decl. ¶ 54.

[77]     Tuliano Decl. ¶ 55; Trial Tr. vol. 8, 919:24–920:3, May 3, 2012, ECF No. 110 ("**Trial Tr. Vol. 8**") ("The stock price is going to . . . reflect a minority value indication; whereas, the valuation that needs to be done of Adelphia for solvency purposes is a hypothetical exchange of the entire company on a controlling basis.  So a control premium would be . . . appropriate.").

[78]     *Id.*; Trial Tr. 164:10–165:3, July 25, 2012, ECF No. 139 ("**7/25/2012 Trial Tr.**").  Tuliano quantified the value of the control premium based on control premiums paid in 1998 in the Leisure & Entertainment and Broadcasting industries as reported in the Mergerstat Review.  Tuliano Decl. ¶ 55 & n.59.

[79]     *See* Tuliano Decl. exh. 1 at 2.

[80]     *Id.*

mergers and acquisitions.[81]  Shaked declined to use the Precedent Transactions methodology

for the same reasons he declined to use Comparable Companies methodology. [82]

Tuliano had three parameters for selecting appropriate transactions to use in this

analysis.[83]  First, Tuliano selected only transactions that involved target cable systems with

more than 300,000 subscribers.[84]  Second, he limited the analysis to transactions that occurred

within the six months before the January 28, 1999 stock buyback. [85]  And third, Tuliano did

not include transactions that were pure "system swaps"—transactions in which one Cable

company *trades* a set of systems with another (rather than selling the systems), because

Tuliano believed that would provide a less reliable indicator of value.[86]

Tuliano found four transactions that fell within his parameters:

(1) Vulcan Venture's acquisition of Charter in July 1998;

(2) Comcast's acquisition of Bell Canada in August 1998;

(3) Charter's acquisition of certain cable systems from Intermedia in January

1999; and

(4) TCI's acquisition of different cable systems from Intermedia in January of

1999.[87]

Though Tuliano initially set out to eliminate any transactions that involved system swaps, he

ultimately included Charter's acquisition of Intermedia, though the transaction was comprised

---

[81]      *Chemtura*, 439 B.R. at 577; Tuliano Decl. ¶ 65.

[82]      Shaked Decl. ¶ 89.

[83]      Tuliano Decl. ¶ 66.

[84]      *Id.*

[85]      *Id.*

[86]      *Id.*

[87]      Tuliano Decl. 25 fig.4.

in part of a system swap and in part of a sale for cash because he reasoned that the cash portion of the transaction would yield a "highly reliable indicator of value."[88]

For the same reasons that he did so in his Comparable Companies analysis, Tuliano relied on the value per subscriber metric as his sole multiple.  The range of multiples for the selected companies was between $3,234 and $3,667, very similar to the range yielded by the Comparable Companies analysis.[89]  Tuliano selected a multiple of $3,277, again qualitatively taking into account the relative upgrade status of Adelphia as compared with the selected companies.[90]

The TEV resulting from Tuliano's Precedent Transactions analysis was $4.845 billion.[91]  To that, he once again added Adelphia's $156.1 million in cash, to yield a TEV of $5.001 billion before adjustments.[92]

### (d) Adjustments to TEV

Shaked and Tuliano each made adjustments to their TEV computations—five, in total—to account for Adelphia's interests in related entities, two of which were acquired at just about the time of the transfer.

### (i) Verto Communications Acquisition

First, each of Shaked and Tuliano considered Adelphia's January 1999 acquisition of Verto Communications, Inc. ("**Verto**"), a cable television company in Pennsylvania. Adelphia acquired Verto for $135 million in Adelphia stock.

---

[88]   Tuliano Decl. ¶ 67.

[89]   *Compare* Tuliano Decl. 25 fig.4 (Precedent Transactions), *with* Tuliano Decl. 19 fig.3 (Comparable Companies).

[90]   Tuliano Decl. ¶¶ 68–69, exh. 1 at 11.

[91]   Tuliano Decl. exh. 1 at 11.

[92]   *Id.*

Shaked assigned *no* value to the Verto acquisition because of the added liability Adelphia undertook by issuing stock in its own fraudulent company.[93]

By contrast, Tuliano added the *entire* $135 million purchase price of Verto (which he assumed was Verto's NAV) to Adelphia's value.[94]  Though Tuliano considered the potential liability Adelphia could incur for issuing fraudulent stock, he determined that any such liability should be excluded because it was "highly uncertain and inherently speculative as of January 28, 1999."[95]

Further, Tuliano noted that Adelphia had "speculative assets" as well, such as certain of Adelphia's tax assets.  Tuliano believed that Adelphia's speculative assets and speculative liabilities (including potential liability for issuing fraudulent stock) should "serve to offset one another in this matter, and so long as they are treated consistently (included or excluded) would have no material effect on the net solvency surplus."[96]

For reasons discussed at greater length below, I find that the full value of Verto would be properly included in Adelphia's valuation.

### (ii) Olympus Partnership Interest

Second, Shaked and Tuliano each considered Adelphia's interest in the Olympus Partnership—which as of January 1999 was only a 2/3 interest, since as of that time, Adelphia had not yet acquired FPL's interest.  Shaked assumed the value of Adelphia's 2/3 interest to

---

[93]     Shaked Decl. ¶ 104.  I understood this to mean that because Adelphia issued its own stock in exchange for the Verto assets, Adelphia could be subject to liability to the stock purchaser (here, Verto) under the '33 and '34 Acts if the stock turned out to be worth less than its assumed value at the time of the sale. As we now know with the benefit of hindsight, less than all of Adelphia's creditors were paid in full (and Adelphia preferred stockholders received no meaningful distribution on their claims), and Adelphia common stock now is effectively worthless.

[94]     Tuliano Decl. ¶ 57, exh. 1 at 2, 11.

[95]     Tuliano Decl. ¶ 57.

[96]     *Id.*

be, at most, twice the value at which Adelphia later acquired Telesat's 1/3 interest in Olympus through the Redemption.[97]  Consequently, Shaked added $216 million to his valuation of Adelphia to account for Adelphia's interest in the Olympus Partnership.[98]

Tuliano, on the other hand, relied on the valuation of FPL's interest in Olympus put forth by another of FPL's experts, Professor Jack Williams ("**Williams**"),[99] of Georgia State University College of Law and, also, Mesirow Financial Consulting.  Like Shaked, Tuliano doubled the value of Telesat's 1/3 interest in Olympus, to reflect the fact that Adelphia had the 2/3 interest in Olympus.[100]  But unlike Shaked, Tuliano used *Williams'* valuation for the FPL Olympus interest, rather than the price Adelphia paid for that interest roughly eight months later.  Tuliano did not apply a control premium (since Adelphia had only a 50% voting interest, an amount insufficient to exercise control), and he discounted the value by an additional 5% "marketability discount."[101]  Accordingly, Tuliano added $318 million to Adelphia's valuation to account for Adelphia's interest in Olympus[102]—roughly $100 million more than Shaked had.

For reasons discussed below, I find that, as urged by Shaked and the Recovery Trust, only $216 million for the Olympus partnership interest would properly be included in Adelphia's valuation.

---

[97]    Shaked Decl. ¶ 107.

[98]    *Id.*

[99]    Tuliano Decl. ¶ 59.

[100]    *Id.*

[101]    *Id.*

[102]    *Id.*  Tuliano assumed Adelphia's interest in Olympus to be $418 million in his original report, but he corrected that number in his declaration.  *Id.*

*(iii) Interest in ABIZ*

Third, Shaked and Tuliano each considered Adelphia's interest in Adelphia Business Solutions, Inc. ("**ABIZ**").[103]  Adelphia held majority economic and voting (and hence controlling) interests in ABIZ of approximately 66% and 86%, respectively.  Shaked assumed that if Adelphia's fraud had been revealed as of the date of the Stock Repurchase, ABIZ would have been insolvent because of its critical dependence on Adelphia to raise capital and fund the ABIZ business.[104]  Thus, Shaked added nothing to his valuation on account of ABIZ.[105]  Tuliano, on the other hand, added the entire market value of the ABIZ stock at the time, and, in addition, a 25% control premium, which collectively amounted to approximately $642 million.[106]

For reasons discussed below, I find that no value for ABIZ should have been added.

*(iv) Receivables*

Fourth, Shaked and Tuliano considered the treatment of receivables owing to Adelphia from related entities.  Shaked did not include a $279 million receivable owing from Olympus

---

[103]    ABIZ was Adelphia Business Solution's stock ticker at the time, and commonly used as a nickname for the company.  In March 2002, about three months before the June 2002 filing of the *Adelphia* chapter 11 cases, ABIZ filed for chapter 11 relief in this district (Bankr. S.D.N.Y. No. 02-11389), and the *ABIZ* chapter 11 case was assigned to me.

Thereafter, in September 2002, still another Adelphia affiliate (Century/ML Cable Venture, a joint venture between Adelphia and Merrill Lynch affiliates which operated two cable systems in Puerto Rico) filed a chapter 11 case in New York.  (Bankr. S.D.N.Y. No. 02-14838).  That case too was assigned to me; the *Adelphia* and *Century/ML Cable Venture* cases were assigned to me as cases related to the earlier *ABIZ* filing.

[104]    Shaked Decl. ¶¶ 112–14.

[105]    Shaked Decl. ¶ 114.

[106]    Tuliano Decl. ¶ 58, exh. 1 at 2, 11.

to Adelphia because he believed Olympus would not have been able to repay it.[107]  By contrast, Tuliano, added the full value of this receivable to his valuation.[108]

Shaked also declined to add the value of receivables from Rigas Family Entities, worth approximately $279 million;[109] Shaked believed they were uncollectable.[110]  By contrast, Tuliano added the full value of these receivables.[111]

For reasons discussed below, I find that the $279 million Olympus receivable should have been added, but that the $279 million Rigas receivable should not have been.

### (v) Non-Cable Assets other than ABIZ

Fifth, each of Shaked and Tuliano added $91 million for Adelphia's non-cable assets other than ABIZ, based on the reported value for these assets in Adelphia's 1998 financial statements.[112]  Here, obviously, there was no difference between them.

### 3. Experts' Conclusions as to TEV After Adjustments

After making the adjustments described in Section III(A)(2)(d) above, each expert then reached a conclusion as to Adelphia's TEV.  Shaked concluded (based on his methodology, which used DCF methodology alone) that Adelphia's TEV was $2.845 billion.[113]  Tuliano concluded (based on his methodology, which included Comparable

---

[107]    Shaked Decl. ¶ 108.

[108]    Tuliano Decl. ¶ 60, exh. 1 at 2, 11.

[109]    The fact that the Rigas Family Entities receivable, after rounding, was $279 million, and that the receivable owing from Olympus to Adelphia, after rounding, was also $279 million, appears to me to be a coincidence.  The numbers were slightly different before rounding, and the former is the sum of $195 million related to a March 1996 co-borrowing agreement and $84 million in intercompany receivables.

[110]    Shaked Decl. ¶ 110.

[111]    Tuliano Decl. ¶ 61.

[112]    Shaked Decl. ¶ 106 & ¶ 106 n.48; Tuliano Decl. ¶ 60, exh. 1 at 2, 11.

[113]    Shaked Decl. 34 "Summary of Adelphia Equity Valuation."  I reach $2.845 billion by adding the value of Adelphia's non-cable assets (valued at $91 million) and Adelphia's interest in the Olympus

-30-

Companies and Precedent Transactions methodology, but not DCF) that Adelphia's TEV was

$6.747 billion, after averaging the values he calculated using each of his methodologies and

after adjustments.[114]

### 4. Experts' Analysis of Liabilities

Now turning to the other side of the analytical balance sheet, each expert also made

assumptions with respect to Adelphia's net debt.  Shaked assumed that Adelphia's net debt as

of the date of the Stock Repurchase was $3.722 billion—a figure slightly greater than the

amount reported in Adelphia's 1998 Form 10-K.[115]  Tuliano relied on each of the assumptions

that Shaked had relied on to find an increase in the net debt over its reported value.[116]  But

Tuliano reduced the net debt by (1) the amount of debt associated with ABIZ, and

(2) proceeds from an equity offering in January 1999 which were used to repay bank debt

after Adelphia's 1998 financial statements were concluded.[117]  Tuliano accordingly assumed

that Adelphia's net debt was approximately $3 billion.[118]

### 5. Experts' Conclusions

Finally, each expert subtracted Adelphia's net debt from its TEV to determine whether

Adelphia was solvent.

Thus Shaked concluded that Adelphia was insolvent, by approximately $1 billion.[119]

---

Partnership (valued by Shaked at $216 million) to Adelphia's starting TEV (determined by Shaked to be $2.538 billion).

[114]    Tuliano Decl. ¶¶ 71–72, exh. 1 at 11.

[115]    Shaked Decl. ¶¶ 100–101 (Shaked revises his original net debt calculation.  *See* Shaked Rept. ¶ 212).

[116]    *See* Shaked Rept. ¶ 212; Tuliano Decl. exh. 1 at 1, 11.

[117]    Tuliano Rept. exh. 1 at 14 & nn.3, 4.

[118]    Tuliano Decl. 26 tbl.2, exh. 1 at 1.  This includes Adelphia's own debt liabilities and co-borrowing agreement liabilities as reflected in the table and exhibit.

[119]    Shaked Decl. ¶ 111.

By contrast, Tuliano concluded that Adelphia was still solvent at the time of the transfer, with an equity cushion of approximately $3.7 billion.

### 6. *My Solvency Conclusions*

For ease of reference, a table showing the experts' figures, and my own, follows this Decision as Appendix A. I find, as facts, that while each expert's analysis had shortcomings—and in several respects, material ones—Tuliano's assumptions and methodology in drawing conclusions as to TEV, on balance, were more appropriate. Thus my own starting and adjusted TEVs—which I find to be in the range of $4.472 to $4.845 billion, and $5.722 to $5.725 billion, respectively[120]—come closer to his. My findings as to Adelphia's liabilities ($3.228 billion) while greater than Tuliano's, also come closer to his.[121] And I find, as a result, that Adelphia still had a net worth at the time of the Stock Repurchase in the range of $2.494 to $2.497 billion.[122] For these reasons (and in the context of the law discussed beginning at page 73 below), I find that on January 28, 1999, the date of the Stock Repurchase, Adelphia was solvent.[123]

The factual predicates for those conclusions follow.

### (a) *Methodology*

As previously indicated, Shaked's valuation presented a TEV of $2.5 billion (before adjustments to TEV), largely accounting for his ultimate conclusion (after adjustments to TEV

---

[120]   App. A at ll. 1 & 9.

[121]   *Id.* at l. 10.

[122]   *Id.* at l. 11.

[123]   For reasons discussed below, Adelphia would have made a constructive fraudulent transfer if it were either insolvent before the transfer in question, or rendered insolvent as a result of it. Here, by reason of my conclusions as to Adelphia's TEV and liabilities (*i.e.*, that Adelphia's TEV exceeded its liabilities by much more than $150 million), the distinction doesn't matter. Thus I simply refer to Adelphia's solvency just before the Stock Repurchase, and without regard to the $150 million decrease in assets resulting from it.

and consideration of liabilities) that Adelphia was insolvent.  Shaked's valuation conclusion was reached after consideration of only discounted cash flow methodology, based on his own projections for Adelphia's cash flow over ten years.

Tuliano's valuation, by contrast, presented a TEV of $6.747 billion after adjustments (more than twice Shaked's valuation), largely accounting for Tuliano's conclusion that Adelphia was solvent.  Tuliano's valuation was reached after a decision on his part not to rely on DCF analysis at all,[124] and to employ instead two market-based methodologies, Comparable Companies and Precedent Transactions.

Upon considering the alternative approaches, I find Shaked's reliance on DCF alone to be inappropriate, and find his assumptions underlying his DCF analysis to have been too arbitrary and speculative.  While Tuliano's analysis was less than perfect in several respects (as demonstrated most dramatically by a TEV in excess of Adelphia's market capitalization ("**Market Cap**") at a time when Adelphia's fraud was in existence but unknown to its investors),[125] I find that Tuliano's methodology was superior, though as discussed below, I question several of his assumptions, and find that his use of those assumptions led to a valuation on his part that I regard as too high.

---

[124]    *See* n.47 above.

[125]    As Shaked noted, *see* Shaked Decl. ¶ 120, as of January 28, 1999, Adelphia had 53.2 million shares outstanding.  The market price of these shares on that date (prior to disclosure of fraud) was $59.06.  By the methodology Shaked then used to compute an Equity Value per Share, those figures would suggest a Market Cap of approximately $3.14 billion.  Shaked pointed out that Tuliano's approach would result in a 23% premium over the market price, at a time when the market was unaware of Adelphia's fraud up to that point.  Shaked's point was persuasive, but he did not explain, to my satisfaction, how the entirety of the value reflected in the $3.14 Market Cap would go away, and in fact, leave the company with $1 billion negative equity as well.  *See id.* ¶ 121.

Shaked calculated this 23% premium over market price using exhibits that Tuliano later updated to reflect a revision in his valuation of the Olympus Partnership.  *See* Tuliano Decl. ¶ 59.  I replicated Shaked's analysis using Tuliano's *revised* valuation, and found a 19% premium over market price.  I have some difficulty seeing how Adelphia's valuation could ever exceed its Market Cap, especially when there had been fraud not yet disclosed.  My valuation (using traditional methodologies) comes in at a level below Adelphia's Market Cap, but to an extent much less than Shaked's.  *See* App. A at ll. 11, 12, 13 & 14.

As a matter of common sense, DCF works best (and, arguably, only) when a company has accurate projections of future cash flows; when projections are not tainted by fraud; and when at least some of the cash flows are positive.[126]  If either of the first two of those can't be found to be true, the factual underpinnings of the DCF computation become unreliable; if the third of them can't be found to be true, it's difficult, if not impossible, to find that the cash flows, by themselves, justify the valuation.[127]  In instances where any of those premises is invalid, the propriety of any use of DCF (and the weight DCF conclusions should be given) becomes debatable at best.  This case is a poster child for the deficiencies in that regard.

In past valuation hearings before me when the company in question had material positive cash flow, I've had the luxury of considering (either by a weighted average or reference to a "football field"[128]) DCF analysis—along with the other two commonly used

---

[126]    This last factor was a major concern in my earlier decision in *DBSD*, determining TEV for a startup company with very valuable assets but with consistently negative projected cash flow.  *See* In re *DBSD North Am., Inc.*, 419 B.R. 179, 197 (Bankr. S.D.N.Y. 2009) (Gerber, J.) ("**DBSD**"), *aff'd*, 2010 U.S. Dist. LEXIS 33253, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010) (Kaplan, J.), *aff'd in part and rev'd in part*, 634 F.3d 79 (2d Cir. 2011), *in each case with respect to other issues*.  In that case, while each of the experts tried to employ a DCF analysis under those circumstances, I told the experts to give me supplemental affidavits describing what their valuation conclusions would be with DCF analysis omitted.  *See id.* at 199.

[127]    As I wrote in *DBSD*:

> While I can see how one might examine a stream of cash flows with some yearly cash flows that were negative, I have difficulty seeing how a stream of *totally negative* cash flows could provide a basis for valuation.  It seems extraordinarily unlikely to me, if not remote, that anyone would pay to secure a stream of uniformly negative cash flows, and thus that a valuation could appropriately be based on such a stream.  Anyone buying an enterprise with such negative cash flows would have to be doing it for some reason *other than* the projected loss stream coming in—asset value, perhaps—but would not be buying it for the privilege of taking an unrelenting stream of losses.

419 B.R. at 197 (emphasis in original).

[128]    For an explanation, and illustration, of a "football field," see *Chemtura*, 439 B.R. at 573 ("Lazard prepared a chart, colloquially referred to as the "football field," upon which the valuation ranges that resulted from each methodology appeared, and which showed a range near the middle where the individual methodology results, for the most part, overlapped); *id.* at 580 (showing a picture of the "football field" in that case).

-34-

methodologies, Comparable Companies and Precedent Transactions. But here, of course, the
ability to use DCF analysis—even with material positive cash flow—was impaired. The fraud
at Adelphia, as both experts recognized, made historical financials and Rigas-era forward
projections unreliable.

But the experts responded to these limitations in drastically different ways. Tuliano
simply declined to employ DCF analysis by reason of the faulty data. Shaked understandably
rejected reliance on the Rigas-era data, but then created his own projections, by what was in
essence creating his own data. I cannot comfortably rely on Shaked's approach.

I was surprised by Shaked's use of DCF methodology alone, in light of the lack of
reliable management projections or company-specific contemporaneous analyst projections.
Shaked formulated assumptions underlying his cash flow projections based only roughly on
projections for the cable industry or the "typical cable company," exposing his analysis to
particularly close scrutiny. And Shaked's decisions to selectively use certain assumptions
from third-party analyst Kagan and others from DLJ led me to question whether his analysis
unduly deflated Adelphia's value.

By way of example, Shaked adopted capital expenditure assumptions from DLJ's
model, which projected extensive upgrades.[129] In turn, DLJ's model projected that the typical
cable company would experience concomitant increases in revenue. But while Shaked
employed DLJ's capital expenditure assumptions (which drove down cash flow),[130] he did not

---

[129]    Shaked Rept. ¶ 105 (citing Dennis Leibowitz, Karim Zia & Jeff Shelton, *Cable Industry Outlook 1998:
Holding the Keys to the Kingdom?*, DLJ Analyst Report, Sept. 23, 1998 , at 41 (Joint Exh. 89) ("**DLJ
Rept.**")).

[130]    Shaked Rept. ¶ 105, exh. 9d, 9e. In DCF analyses I've seen in the past, cash flow was not materially
affected by capital expenditures, if indeed cash flow was affected at all. But here, both sides repeatedly
discussed the effect of capital expenditures on operating cash flow. For that reason (as I'd assumed that
CapEx would affect cash flow, but not *operating* cash flow) at closing arguments I requested that the
parties clarify their use of the term "cash flow" as they had used it. The Recovery Trust did not address
the issue directly, but Shaked's analysis reflects that capital expenditures were deducted from projected

utilize DLJ's revenue assumptions (which would tend to drive cash flow up).[131]  Instead,

Shaked utilized Kagan's lower growth rate.[132]  While I believe that Shaked made this choice

as a result of the unavailability of analyst reports, and not data manipulation, that decision

underscores the excessively arbitrary, and ultimately speculative, nature of Shaked's analysis

and its susceptibility to inaccuracy.

I think all would agree, and in any event I find, that that the fraud at Adelphia made

use of DCF methodology difficult.  But in my view (and here too I find), use of alternative

established metrics would be superior to reliance on DCF—and especially to *sole* reliance on

DCF.  The uncertainties in the data that Shaked developed and then used to craft a DCF

analysis—which he then used as his only valuation methodology—make his methodology

choice unpersuasive.

As discussed below, I differ with some of the adjustments Tuliano made after he first

computed a starting TEV, but I find that his decision to rely on Comparable Companies and

Precedent Transactions analysis here, where DCF methodology would be unwise, was sound.

---

cash flows.  *See* Shaked Rept. exh. 7c (deducting CapEx before determining debt free cash flow).  And though FPL Group stated that operating cash flow did not include capital expenditures, its counsel George Zimmerman continued to discuss the effect of capital expenditures on operating cash flow.  *See* 7/25/2012 Trial Tr. at 10:14–11:1 (The Court: "Mr. Zimmerman, you in particular, at Page 36 of your brief, talked about operating cash flows.  I have normally thought of operating cash flows as being a different way of saying EBITDA.  But there was . . . an implication . . . that operating cash flows might also include cash flows as they would be needed to be used for CapEx, capital expenditures.  I would like you folks to clarify when you think operating cash flows should or should not include checks that you'd have to write out for capital expenditures, because I saw a double entendre or potential failure on my part to understand which of the two alternatives you were talking about."); 7/25/2012 Trial Tr. at 131:19–21 (Zimmerman: "You asked a question.  We use 'operating cash flow' the way you use EBITDA, they're synonymous. . . .").

I now understand the parties to be using the term "cash flow" to represent operating cash flows less CapEx, along with other, smaller, adjustments.  I consider the inclusion of CapEx to be appropriate in this context because of the significance of upgrade expenditures in the growing cable industry at the time.

[131]    *Compare* DLJ Rept., *with Cable TV Investor*, PAUL KAGAN ASSOCIATES, INC., Aug. 10, 1998, at 4–5 (Joint Exh. 100) ("**Kagan Rept.**").  *See also* n.132 below; Tr. 937:10–938:7.

[132]    Shaked Rept. ¶¶ 80–82, exh. 9b, 9c (citing Kagan Rept. 4–5).

After Adelphia completed its restatement effort with respect to its financials, after the Rigases were ousted, Adelphia's count of the number of its subscribers was one of the most accurate of its financial data.  Tuliano's value per subscriber metric utilized one of Adelphia's most reliable historical metrics.  For cable companies, cash flow, which drives valuation, is directly correlated with subscriber number—and in any event, subscriber number is widely used for valuation in mergers and acquisitions in the cable industry and was used for the eventual sale of Adelphia's assets to Time Warner.[133]  And the narrow range within which the Comparable Companies multiples lay makes me comfortable that Adelphia would have been able to sell its assets roughly within that range.

Shaked and the Recovery Trust were correct, in my view, in assertions they made to me that relative upgrade status and lower profitability per subscriber are factors that would cause a Comparable Companies analysis to be less reliable.  But no valuation methodology is certain; each allows the introduction of the expert's judgment.  Here, Shaked's analysis allowed too much room for judgment and speculation.  Tuliano's analysis was more closely tied to the market and the price Adelphia could actually receive for its assets in a sale.[134]

---

[133]    I find Shaked's criticism of Value per Subscriber analysis in the trial before me—what was effectively a retreat from his earlier view in the *Bank of America* litigation—unpersuasive.  In the years in question, every or nearly every major cable operator was making upgrades in its system to effect the changeover from analog to digital, and to provide additional services like video on demand, broadband internet, and telephony.  These changes would require material CapEx—some of which would already have been completed and some of which would have to be undertaken in the future.  The seemingly comparable companies would inevitably be in different stages of the upgrade process, and would have different levels of profitability. But to the extent that such was material, one could take material differences into account.  I therefore conclude that while Shaked was undoubtedly right when he believed that other, seemingly comparable, companies would have differences in their upgrade status and profitability, that would be an insufficient basis for wholly disregarding Value per Subscriber analysis—and I choose to find in accordance with what Shaked said in the quoted portion of his *Adelphia-Bank of America* litigation report, *see* n.69 above, as contrasted to what he told me in this trial.

[134]    Shaked also critiqued Tuliano's analyses, providing one main criticism.  Shaked argued that Tuliano's calculation of subscriber number was incorrect, and further, that the subscriber count for 1998 was unreliable.  As described in the Capital Adequacy section below, Tuliano and Shaked disagreed with respect to how to calculate subscriber number for 1998, on a cable-only basis, since the post-Rigas Era audit provided only a number for Adelphia's 1998 subscribers on a consolidated basis.  But I agree with

It also is not uncommon, if not also customary, for valuation experts to use alternative valuation methodologies as a "sanity check" to test the reasonableness of conclusions based on a particular methodology.[135] Here Shaked did not do so, and his failure to do so, in my view, was a material deficiency in the quality of his analysis.

But there were two potential computations that might also serve as a "sanity check" that Tuliano did not employ either. One was a DCF analysis of the type Shaked employed, even if such a DCF analysis could not by itself support a valuation.[136] Another was Adelphia's Market Cap, which Tuliano's valuation exceeded by approximately 19%.[137] Each of, in my view, would require a valuation lower than Tuliano's.

To what extent is less clear. Assuming, as I do, that Tuliano's valuation was 19% over the valuation that would be implied by Market Cap, I can't find anything in the record that would dictate, with any precision, the extent of the necessary adjustment that would accordingly need to be made. But while I think some adjustment should be made, I would still come much closer to Tuliano's conclusions than Shaked's, and Adelphia would not fall so far in value as to hit insolvency. Assuming, by way of example, that Tuliano's valuation was 19% too high, Adelphia would still not be insolvent. Adjustments of that character would suggest, instead, a net equity (even using Tuliano's lower, $4.472 billion starting TEV computation, which would result from his Comparable Companies methodology)

---

Tuliano that the appropriate method for calculation would involve distinguishing between the portion of the reduction due to Olympus subscribers and the portion attributable to other reasons. Accordingly, I accept Tuliano's conclusions regarding subscriber number both for the purposes of the solvency analysis and the capital adequacy analysis addressed below.

[135]   *See, e.g.*, *Chemtura*, 439 B.R. at 580 ("Comparable Companies and Precedent Transactions analyses were employed, but not to reach separate valuations that would then be considered to provide a composite or blended valuation. Instead, they were used only as a species of check—sometimes referred to as a "sanity check"—on the valuation UBS arrived at by its use of DCF.").

[136]   Tuliano arguably used DCF as a sanity check. *See* n.47 above.

[137]   *See* n.125 above.

approximately $600 million lower (taking a 19% discount), depending on adjustments to the

starting TEV discussed in the section that follows.  Even taking the 19% discount, and

assuming the adjustments made by Tuliano in his Comparable Companies analysis, Adelphia

would have been solvent by over $3 billion.

Rather clearly, in my view, such a Market Cap "sanity check"—when applied to

Shaked's analysis, as Shaked proposed such a sanity check should be applied to Tuliano's—

would not suggest the negative valuation Shaked proposed, even assuming (as I do) that

Adelphia had engaged in some fraud before the infamous co-borrowing facilities that came

thereafter.

### (b) Adjustments to Value

Other disputes exist with respect to adjustments to value that each expert made *after*

employing their respective valuation methodologies.  I address these now.

### (i) Verto Communications

First, the parties dispute the value that should be attributed to Verto.  Shaked attributed

no value to Verto based on the potential '33 Act and/or '34 Act liability Adelphia might have

incurred by issuing stock in its own fraudulent company.[138]  By contrast, Tuliano included

Verto's full value, as measured by the $135 million purchase price then paid.[139]

On balance, I agree with Tuliano, though the matter would be closer if we were to

consider an alternative for which neither expert argued, counting the Verto assets' value with

a discount.  The outcome of litigation that was never brought is too speculative to justify

disregarding the entirety of the value of the Verto assets.  I doubt that any litigator writing a

FASB 5 letter would have advised Adelphia's accountants that a loss contingency for Verto

---

[138] Shaked Decl. ¶ 104.

[139] Tuliano Decl. ¶ 57.

liability before the co-borrowing arrangements were put in place was "probable," and I don't think the amount of any resulting liability could reasonably be estimated.

But I don't believe that any such litigator would say that the liability was "remote," either.  If litigation had been brought by Verto at the time of the Stock Repurchase (it being remembered that at this point in time, Adelphia was much less fraudulent than thereafter), I think it is nevertheless very possible that Verto could establish some fraud.  But the more likely probability under those circumstances is that at that time, the Adelphia stock was overvalued but not worthless.  Whether the fraud would have been material enough to obtain rescission, or would have resulted in damages in a sizeable amount, is far less clear, and ultimately too speculative to warrant discounting the Verto assets entirely.[140]

So then we get to the more difficult question of whether I should employ an assumption that neither expert did—that Verto value should be included, but with a haircut.  Tuliano believed—reasonably, in my view—that contingent, unliquidated, assets and liabilities should be treated uniformly across the valuation.  Other contingent assets and liabilities did not result in adjustments to value.  It would be inconsistent, in my view, to do so here, without engaging in a similar inquiry with respect to every such asset and liability.  Because Shaked provided no other reason for omitting Verto's value, I find that the full value of Verto was properly included in Adelphia's valuation.

*(ii) Olympus*

Second, the parties dispute the value that should be ascribed to Adelphia's interest in Olympus.  The amount of value Tuliano attributed to Olympus was based on Jack Williams'

---

[140]        I could, I suppose, take a view at neither extreme, and attribute value to Verto but with a "haircut" to take into account a potential settlement of '33 or '34 Act liability that might have resulted from the Verto purchase.  But the amount of that haircut would also be speculative.

expert opinion regarding Olympus' value. But Shaked's value was based on the actual price

Adelphia paid for Olympus, only a few months later.

I believe that the actual price fixed in that transaction, which appears to have been at

arms length and without any taint, is more probative than any expert opinion would be. For

that reason, I accept the $216 million value that Shaked ascribed to Olympus, rather than

Tuliano's $318 million, and find that only $216 million for the Olympus interest would

properly be included in Adelphia's valuation.

*(iii) ABIZ*

Third, the parties differ with respect to the propriety of including the value of

Adelphia's interest in ABIZ. Shaked asserted that Adelphia's interest in ABIZ was worthless

because of ABIZ's reliance on Adelphia for capital, ABIZ's financial weakness generally, and

the likelihood that ABIZ would become insolvent if Adelphia's fraud were exposed. In

particular, the Recovery Trust provided statements from ABIZ's 10-K supporting the

Recovery Trust's position as to ABIZ's precarious financial position, and analyst reports to

the same effect.[141] Tuliano provided no meaningful counterarguments when he included

ABIZ's total book value and even added a control premium, amounting to $642 million. The

Recovery Trust's position as to this was effectively uncontroverted, and the documents upon

which the Recovery Trust relied—irrespective of the failure to dispute them—support the

Recovery Trust's position. I think any value for ABIZ should have been excluded.

*(iv) Rigas Family Entities*

Fourth, Shaked and Tuliano disagreed with respect to the treatment of receivables

owing to Adelphia from Rigas Family Entities. Tuliano added the full value of these

---

[141]    Shaked Rept. exh. 11.

receivables to Adelphia's value, while Shaked added no value, because he did not believe they would be repaid. With respect to the Rigas Family Entities, I agree with Shaked. If fraud at Adelphia had been exposed, I believe it highly improbable that the Rigas Family Entities would have paid back the loan.[142]

The $279 million receivable from the Rigas Family Entities should be omitted from Adelphia's valuation.

### (v) Olympus

Fifth, while a similar issue exists with respect to the $279 million receivable from Olympus, I feel differently. Olympus did not have the creditworthiness problems that ABIZ or the Rigas Family Entities had, and was in fact generating positive cash flow. Thus, I agree with the inclusion of the Olympus $279 million receivable in full.

### (vi) Noncable Assets Other than ABIZ

Sixth, both sides agree on the propriety of an addition of $91 million to cover the value of noncable assets other than ABIZ, as do I.

### (c) Net Debt

Though they generally agreed with respect to increases in Adelphia's debt over the debt reported in Adelphia's 10-K for 1998, Shaked and Tuliano differed in two respects. In one case I agree with Tuliano, but in the other I agree with Shaked.

### (i) ABIZ Debt

Tuliano reduced Adelphia's net debt by the amount of ABIZ's debt—$494 million. But Shaked provided only "hunches" regarding commingling of assets between ABIZ and

---

[142]   While the Restatement Team expressed a view that the Rigas Family Entities receivables were unimpaired, its later view, albeit in a different context, was that the Rigas Family Entities lacked sufficient liquid assets to repay the co-borrowing debt. Direct Trial Declaration of Robert J. DiBella ¶ 34 & n. 34, Apr. 17, 2012, ECF No. 98.

Adelphia to support inclusion of ABIZ's debt in Adelphia's net debt for solvency purposes.[143] I agree with Tuliano that ABIZ's debt should have been excluded.

I do so for two reasons. First, I've already determined, for reasons discussed above,[144] that contrary to Tuliano's view, the value of ABIZ should have been excluded. Since the value of ABIZ should have been excluded, it would be improper, in my view, to then include ABIZ liabilities, as there was no showing that Adelphia was a guarantor of them, or otherwise on the hook for them.[145]

Second, I agree that Shaked's "hunches" were too speculative and are unsupported on this record. Based on what I heard during the course of Adelphia's underlying chapter 11 case, I don't regard Shaked's assumptions of commingling of assets between ABIZ and Adelphia to be implausible. But I'm uncomfortable relying on views I formed in the underlying chapter 11 case in a separate adversary proceeding in which evidence that might support those views was not introduced.[146]

Thus I conclude that Adelphia's net debt should be reduced by the amount of ABIZ's debt.

### (ii) Repayment of Bank Debt

Then, Tuliano reduced Adelphia's debt by $222 million, representing the paydown, after December 31, 1998 and before the Stock Repurchase, of bank debt in that amount after

---

[143]     Expert Rebuttal Rept. of Professor Israel Shaked ¶¶ 38–42, Apr. 5, 2011 (Joint Exh. 61) ("**Shaked Rebuttal Rept.**").

[144]     *See* p. 41 above.

[145]     Even if ABIZ were worthless, its liabilities at least arguably would properly have been taken into account if Adelphia were a guarantor or otherwise liable for them, but here I heard no evidence that Adelphia was either a guarantor or otherwise liable.

[146]     That's especially so since my factual findings here are subject to de novo review by a district judge who was not present during the five pre-confirmation years during which Adelphia's underlying chapter 11 case was before me, and who would have no basis for making, or verifying, factual findings that I made in that regard.

an equity offering which raised $372 million.[147]  Approaching the matter slightly differently, Shaked excluded from Adelphia's TEV the $372 million in equity proceeds (and did not reduce Adelphia's net debt by $222 million, $372 million, or any other amount) because the equity offering proceeds were not applied to reduce Adelphia's outstanding debt, but rather the outstanding debt of Olympus and the Rigas's Hilton Head Communications ("**Hilton Head**").[148]

I think Shaked was right in refusing to reduce Adelphia's net debt by the amount of the equity proceeds (or by the lesser amount Tuliano used).  The equity proceeds were used for the repayment of debt of non-Debtor entities.  And while Adelphia had contemplated a later repurchase of Olympus, the price at which it would do so was not fixed, and it was not shown to my satisfaction that there would be a dollar-for-dollar correlation between paydown of Olympus debt and the price for Olympus that was ultimately paid.

Thus, I conclude that Adelphia's net debt should not have been reduced by the amount of the equity proceeds used to pay down Olympus and Hilton Head debt.

### (d)  My Finding re Solvency

The facts found above underlie my ultimate factual finding, set forth above and below, that after adjusting for my own computation of an appropriate starting TEV, and for appropriate adjustments to value and debt, Adelphia still had net equity in the range of $2.494 to $2.497 billion.

Thus Adelphia was still solvent at the time of the Stock Repurchase.

---

[147]    Tuliano Decl. exh. 1 at 14 n.3.  Tuliano calculated a cumulative adjustment of $222 million, which equaled "the equity proceeds of [$372 million] as of January 14, 1999 received from Adelphia's completed Class A Common Stock offering used to repay subsidiary bank debt less [$150 million] in additional borrowings in advance of the Company's share repurchase from FPL Group."  *Id.*

[148]    Shaked Rebuttal Rept. ¶ 53; Shaked Decl. ¶¶ 62, 102.

## B.

## Capital Adequacy

I then need to consider whether Adelphia, even if it were still solvent, was left with insufficient capital at the time of the Stock Repurchase.  The Recovery Trust and FPL each had its solvency expert provide an opinion on capital adequacy as well.  Shaked, on behalf of the Recovery Trust, opined that Adelphia would lack adequate capital to maintain its operations over a three-year period following the Stock Repurchase, based primarily on its negative free cash flow and lack of access to capital markets.[149]  Tuliano, on behalf of FPL, opined that Adelphia would have adequate capital to maintain operations, based primarily on its equity cushion and continued access to capital markets.[150]

With respect to this issue, I agree with Tuliano.

### 1. Capital Needs

Each expert utilized (1) cash flow projections and (2) Adelphia's reported debt maturities (all from Adelphia's 1998 Form 10-K) to project Adelphia's capital needs during the years following the Stock Repurchase.  Understandably, neither used management or contemporaneous analyst cash flow projections by reason of the fraud's effect on those projections, as discussed above.[151]

Instead, Shaked used the same cash flow projections he used in his DCF analysis, but limited to a three-year horizon.[152]  Shaked concluded that Adelphia would need approximately $658 million to meet its capital needs between 1999 and 2001.[153]

---

[149]    Shaked Decl. ¶¶ 54–60.

[150]    Tuliano Decl. ¶¶ 100–101, 119–137.

[151]    *See* nn.47–49 and accompanying text.

[152]    Shaked Decl. ¶¶ 46–53.

[153]    Shaked Rept. ¶ 132 & exh. 4i.

Tuliano, by contrast, did not create his own cash flow projections, but instead "corrected" Shaked's cash flow projections by changing a number of the assumptions.[154] Tuliano concluded that Adelphia would need a lesser $531 million (approximately) during the three years following the Stock Repurchase.[155]

Tuliano's adjustments to Shaked's cash flow projections account for the entirety of the difference in the experts' assessments of capital needs. Tuliano made four main adjustments:

### (a) Subscriber Number

First, Tuliano adjusted Shaked's subscriber number. In 1998, Adelphia reported that it had 2,162,858 subscribers on a consolidated basis,[156] and 1,528,307 wholly-owned subscribers.[157] By reason of fraud, however, Adelphia's reported number of subscribers for 1998 was incorrect. Noting this, each expert made assumptions regarding Adelphia's true number of subscribers.

Both used audit "issue summaries" created during the restatement process for guidance.[158] The restatement, however, did not specifically restate 1998 (as it covered only 1999 through 2003), and it restated Adelphia's financials only on a consolidated basis. Still, "Issue Summary G-6" adjusted the number of Adelphia's consolidated subscribers prior to 1999 downward, from 2,162,858 to 1,943,205—a reduction of 219,653 or approximately

---

[154]     Tuliano Decl. ¶¶ 102–15.

[155]     Tuliano Decl. 46 tbl.5.

[156]     Adelphia Commc'ns Corp., Issue Summaries: Audit Issues for Restatement of Financial Statements for 1999, 2000, 2001 and 2002, Issue Summary G-6 at JX 011-322 (Dec. 1, 2004) (Joint Exh. 11) ("**Issue Summary G-6**"). Combining Adelphia's wholly-owned subscriber number (1,528,307) and Olympus subscriber number (641,575) from its 1998 Form 10-K, *see* n.157 below, leads to a slightly different result (2,169,882 consolidated subscribers).

[157]     Adelphia Commc'ns Corp. Annual Report (Form 10-K) at JX 013-008 (May 25, 1999) (Joint Exh. 13) ("**Adelphia 1998 Form 10-K**").

[158]     Issue Summary G-6.

-46-

11.3%.[159]  Assuming that Adelphia's wholly-owned subscribers were overstated by the same

percentage, Shaked reduced the reported number of wholly-owned subscribers by 11.3% as

well—yielding his conclusion that on December 31, 1998, Adelphia had 1,373,097

subscribers.[160]

      But Tuliano contended that this was a flaw in Shaked's analysis.  Tuliano

distinguished the portion of the adjustment in Issue Summary G-6 attributable to exclusion of

Olympus subscribers from the portion attributable to other reasons.[161]  Tuliano argued that

roughly 77% of the adjustment was due to the elimination of Olympus subscribers from

Adelphia's consolidated subscriber count.[162]  Tuliano contended that because Shaked began

with the number Adelphia reported on its Form 10-K—which was already net of Olympus

subscribers—reducing that number proportionate to the reduction in consolidated subscribers

effectively double-counted a reduction on account of exclusion of Olympus subscribers.[163]

For that reason, Tuliano subtracted only the portion of the subscribers reduction that he

contended was not attributable to Olympus.  Thus Tuliano assumed that Adelphia had

1,478,529 subscribers, 105,432 more than Shaked did.[164]

      The effect of this adjustment was a decrease in the debt-to-EBITDA ratio[165] from

9.15x to 8.62x.[166]

---

[159]    Issue Summary G-6 at JX 011-322; Shaked Decl. ¶ 46.

[160]    Shaked Decl. ¶¶ 46–47.

[161]    Tuliano Decl. ¶¶ 103–106.

[162]    *Id.* ¶ 103 & ¶ 103 n.5.

[163]    *Id.* ¶¶ 103–106.

[164]    Tuliano Decl. ¶ 90.

[165]    Leverage—and more specifically, a leverage ratio—can be measured by comparing the debt to various things.  Here the parties spoke of the ratio of Adelphia's debt (long term debt for the cable division) to its EBITDA (measured using last-quarter-annualized operating figures), and I will do likewise.  *See* Flynn Rept. ¶ 52 & 27 n.78; Shaked Rept. ¶ 55.  As Shaked explained, "[t]he debt-to-EBITDA ratio . . .

As noted below, I accept Tuliano's assumptions regarding Adelphia's true number of subscribers.

### (b) Olympus Consolidation

Second, Tuliano consolidated Olympus into Adelphia's cash flow projections. Tuliano contended that consolidation was appropriate because the Olympus Redemption was known as of January 28, 1999 and because the transaction was expected to close in the third quarter of 1999—which it almost did, closing on October 1, 1999, only one day thereafter.[167] By contrast, Shaked did not include Olympus' cash flow because the Redemption had not taken place, nor had the final terms been agreed to, and because Shaked believed it unlikely that the Redemption would have occurred if Adelphia's fraud were known.[168]  The effect of Tuliano's adjustment, net of his other adjustments, was to decrease Adelphia's leverage ratio from 9.13x EBITDA to 8.62x EBITDA.[169]

As noted below, in this respect I agree with Tuliano.  As of the time of the Stock Repurchase, it was not clear that the Redemption would take place (or in what size), but for purposes of making cash flow projections in determining capital adequacy, the experts were engaged in a forward looking exercise, and could reasonably take into account probabilities.

---

measure[s] the amount of debt owed by a company relative to the earnings available to service the debt." *Id.* ¶ 56.

[166]   Shaked Decl. ¶¶ 65–66.  At first blush, the distinction between 9.15x and 8. 62x might not appear to be material.  But because the adjustment brought the debt-to-EBITDA ratio below 8.75x, a level required under Adelphia's borrowing agreement, the distinction could be of significance.

[167]   Tuliano Decl. ¶ 107.

[168]   Shaked Decl. ¶ 63.

[169]   Shaked Decl. ¶ 64.

Real life was consistent with the probabilities.  The Olympus Redemption took place on

October 1, 1999, which is the date from which Tuliano included Olympus' cash flows.[170]

### (c)  Equity Issuance

Third, Tuliano included proceeds from Adelphia's equity issuance on January 14,

1999.  The equity issuance (which was at a price of $43.25 per share) raised approximately

$372 million.[171]  Shaked omitted these proceeds because they were used to pay down

Olympus and Hilton Head debt, and for that reason, he assumed the proceeds would have no

effect on Adelphia's balance sheet.[172]  But Tuliano chose to include them to the extent that

they were used to pay down Olympus debt in his capital adequacy analysis for the same

reasons that he chose to consolidate Olympus cash flow with Adelphia's—*i.e.*, that the

Olympus Redemption was scheduled to occur in 1999, so any Olympus debt that was paid

down would affect Adelphia's balance sheet.[173]  Tuliano also chose to include the amounts

used to repay Hilton Head debt because he assumed an intercompany receivable would have

been created and repaid shortly.[174]  Shaked criticized that assumption as he noted that the

Rigas Family Entities were net borrowers over time, and could not have repaid the amounts

they received from Adelphia.[175]

The effect of Tuliano's adjustment, net of his other adjustments, was to reduce

Adelphia's leverage ratio from 9.54x EBITDA to 8.62x EBITDA.[176]

---

[170]    *See* Tuliano Decl. ¶ 107 ("I have corrected Prof. Shaked's analysis by including Olympus' cash flows commencing October 1, 1999.").

[171]    Tuliano Decl. ¶ 111; Shaked Decl. ¶ 62.

[172]    Shaked Decl. ¶ 62.

[173]    Tuliano Decl. ¶ 111.

[174]    *Id.*

[175]    Shaked Decl. ¶ 62.

[176]    *Id.*

For the reasons discussed below, proceeds from Adelphia's equity issuance should not have been included in the cash flow projections.

### (d) CapEx

Fourth, and finally, Tuliano adjusted Shaked's assumptions regarding CapEx. I heard considerable evidence, and even more argument, as to the extent to which Adelphia would have to upgrade its systems in the years following the Stock Repurchase. Shaked assumed that Adelphia would need to upgrade between 90 and 100% of its systems by 2001,[177] while Tuliano assumed that Adelphia would have until 2003 to upgrade its systems, and would only have to upgrade 75% of its systems by then.[178]

On this point, two additional experts were called. The Recovery Trust called Robin Flynn ("**Flynn**"), and FPL called Christian Dippon ("**Dippon**"). I find that both showed satisfactory expertise with respect to the cable television industry.[179]

Flynn testified that between 1998 and 2000, "it was absolutely crucial for cable operators to upgrade their plant and add new services to counter DBS [Digital Broadcast Satellite, such as DirecTV] competition."[180] During that time period, Flynn testified, Adelphia was "substantially less upgraded than the other major MSOs [Multi-System

---

[177]    Shaked Rept. ¶¶ 117–19; Shaked Decl. ¶ 71.

[178]    Tuliano Decl. ¶¶ 108–110.

[179]    The Recovery Trust criticized Dippon for not being an industry analyst or cable industry expert, but rather an economist. Plaintiff's Post-Trial Mem. of Law 16, June 22, 2012, ECF No. 124 ("**Recovery Trust Post-Trial Br.**") ("Ms. Flynn was the only pure cable expert to testify."); Rebuttal Rept. of Robin V. Flynn ¶ 2, July 15, 2011 (Joint Exh. 58) ("**Flynn Rebuttal Rept.**") ("Mr. Dippon, possibly because he did not seem to be involved in analysis of the cable industry in the 1998–2001 time period, displays an ignorance of the prevailing trends and industry mind-set of the time."). I was not troubled by Dippon's background. While he was not an industry analyst, he specialized in telecommunications economics for over 15 years, and had extensive qualifications to support his expertise. *See* Decl. of Dr. Christian M. Dippon ¶¶ 1–4, Apr. 17, 2012, ECF No. 104 ("**Dippon Decl.**"). Moreover, he provided a thoughtful analysis, demonstrating expertise.

[180]    Direct Trial Testimony Decl. of Robin V. Flynn ¶ 16, April 17, 2012, ECF No. 99 ("**Flynn Decl.**").

Operators]" both with regard to bandwidth and two-way transmission capability.[181]    Flynn

believed, accordingly, that Adelphia was a laggard in the industry, and could not delay its

upgrade.[182]

Based in part on Flynn's analysis, Shaked then assumed that Adelphia would have to

upgrade between 90 and 100% by 2001.  Shaked also relied on management projections that

network upgrades would be 95% complete by 2000, as they appeared in Adelphia's 1998

Form 10-K, and as they were interpreted by analysts from Goldman Sachs and Kagan.[183]

Though Dippon agreed that Adelphia needed to upgrade its systems, he testified that

"[t]here was no competitive imperative for Adelphia to engage in a *three-year* upgrade

program, as set forth by Prof. Shaked."[184]  I agree, and so find.  Dippon criticized Flynn and

Shaked for failing to consider whether other upgrade strategies were viable options.[185]

Further, Dippon estimated that the upgrade status with regard to bandwidth for a typical cable

company was only 90% by 2001 and 92% by 2003, indicating that Flynn and Shaked were too

aggressive in assuming that Adelphia had to fully complete its upgrade by 2001.[186] (Indeed,

Flynn herself estimated that by 2001, only 90% of the industry's plant was upgraded with

---

[181]    Flynn Decl. ¶ 8. For example, in 1997, Flynn, like other analysts, believed that less than 35% percent of Adelphia's plants had upgraded their bandwidth but that by year-end 1998, the cable industry as a whole was thought to have approximately 70% of its networks upgraded. *Id.*  Additionally, in August 1998, Flynn, like other analysts, believed that only 20% of Adelphia's cable plant was two-way capable, but that by year-end 1999, the industry average was expected to be 55%.  *Id.* ¶ 9.

[182]    Flynn Decl. ¶ 16 ("Like the rest of the cable industry, Adelphia could not delay its upgrade because it needed to develop the capability to offer advanced services to compete with DBS, and to meet investors' expectations that it generate comparable revenue and cash flow growth to that of the other major MSOs.").

[183]    Shaked Decl. ¶¶ 67–68.

[184]    Dippon Decl. ¶ 8 (emphasis added).

[185]    Dippon Decl. ¶¶ 92–95.

[186]    Dippon Decl. ¶¶ 54–62 (referencing DLJ Report 23, 33 app. 1).

regard to bandwidth and 80% upgraded with regard to two-way capability.[187])  Based primarily on Dippon's analysis, though also on management's representations in Adelphia's 1998 Form 10-K, Tuliano assumed that Adelphia would only have to upgrade 75% of its systems by 2003.[188]

Based in material part on their differences in methodology, Shaked and Tuliano came to different conclusions regarding Adelphia's capital needs in the three years following the Stock Repurchase.[189]  Tuliano, on behalf of FPL, estimated that approximately $531 million would be needed; Shaked, on behalf of the Recovery Trust, estimated that $658 million would be required.[190]

The effect of Tuliano's adjustment, net of his other adjustments, was to decrease Adelphia's leverage ratio from 8.78x EBITDA to 8.74x EBITDA.[191]

For the reasons discussed below, I find Adelphia's capital need to be in the range of $600 million, a figure between the estimates provided by FPL and the Recovery Trust.

   2.  *Access to Capital*

While the two sides' conclusions on Adelphia's capital needs were divergent by only approximately 20%, the two sides strongly disagreed with respect to Adelphia's ability to *meet* those needs—*i.e.*, by borrowing, selling assets, or otherwise generating the capital required.

The Recovery Trust contended that Adelphia would not be able to meet its capital needs—making three main arguments to support that position.  First, the Recovery Trust

---

[187]   Expert Rept. of Robin V. Flynn ¶ 24, June 23, 2004 (Joint Exh. 57) ("**Flynn Rept.**").

[188]   Tuliano Decl. ¶ 110.

[189]   Tuliano Decl. 46 tbl.5.

[190]   Shaked Rept. exh. 4i.

[191]   Shaked Decl. ¶ 71.

argued that Adelphia's *high leverage ratio* would (1) lead to defaults on its existing debt

covenants (or at least restrict access to additional debt from existing sources), and (2) restrict

Adelphia from acquiring capital from new sources.  Second, the Recovery Trust argued that

because of its existing *debt covenants*, Adelphia would be unable to sell its assets to satisfy its

capital needs.  Third, the Recovery Trust argued that if the *fraud at Adelphia became known*

to investors, Adelphia's access to capital markets would have been cut off.  While the

Recovery Trust admitted that any of these factors in isolation would not necessarily cause

access to capital markets to be restricted or cut off entirely, it argued that the confluence of the

factors would.[192]

In opposition, FPL disputed each of those arguments, and further contended that

Adelphia had an equity cushion that made it likely that investors would be willing to provide

Adelphia with capital.  For those reasons, FPL argued that Adelphia would be able to meet its

capital needs notwithstanding the facts now known about Adelphia's financial condition at the

time of the Stock Repurchase.

### (a)  High Leverage Ratio

I first need to address the Recovery Trust's contention that Adelphia was so over-

leveraged at the time of the Stock Repurchase (and that Adelphia would continue to be so in

following years) that Adelphia would not have had access to capital from new or existing

sources.

---

[192]    Shaked Decl. ¶¶ 78–79; Trial Tr. vol. 4, 421:23–422:3, 456:22–457:10, May 1, 2012, ECF No. 115
("**Trial Tr. Vol. 4**").  Notably, the Recovery Trust did not argue that the fraud at Adelphia, in and of
itself, would make acquiring financing impossible.  Indeed, at closing arguments, counsel for the
Recovery Trust stated "And I don't think we really needed the testimony of . . . Professor Tabak, who
said something entirely unremarkable; that when a company engages in fraud, [it] can still access the
capital markets if its financial performance is such that it remains creditworthy.  We've never said that
fraud, in and of itself, without more, will automatically, under all circumstances, make a company
uncreditworthy."  Trial Tr. 7/25/2013 Tr. 15:1–7 (transcription errors corrected).

As reported in Adelphia's Form 8-K, Adelphia had existing debt agreements which provided that its indebtedness could not exceed 8.75x EBITDA.[193]  Shaked observed that Adelphia's reported debt-to-EBITDA ratio at the end of 1998 was 9.9x,[194] an amount that exceeded, quite obviously, that 8.75x level.  But the two sides disagreed with respect to what Adelphia's leverage ratio would be in the following years.  Shaked projected Adelphia's debt-to-EBITDA ratio to be 11.6x, based on his own projections of Adelphia's performance in 1999 and Adelphia's restated debt figures.[195]  Tuliano calculated Adelphia's debt-to-EBITDA ratio to be 8.69x at the time of the Stock Repurchase, and lower in subsequent years.[196]

Based on Shaked's calculation of Adelphia's leverage ratio, the Recovery Trust argues that Adelphia "had no right to borrow and was subject to the exercise of default remedies by its creditors at every level of its capital structure."[197]  Since Shaked calculated Adelphia's debt-to-EBITDA ratio to be at least 9.9x (and likely higher if restated), the Recovery Trust argued that Adelphia exceeded the maximum authorized under Adelphia's borrowing covenants.  For this reason, the Recovery Trust argued that it would be unreasonable to assume that Adelphia would be able to access additional funding from existing debt sources to meet its capital needs.

FPL countered (based on Tuliano's calculation that Adelphia's debt-to-EBITDA ratio was 8.69x in 1999 and lower in subsequent years) with the assertion that Adelphia had not breached its debt covenants at the time of the Stock Repurchase.  And FPL further argued that

---

[193]    Shaked Rept. ¶ 134 & n.9 (quoting Adelphia Commc'ns Corp. Current Report (Form 8-K) (Jan. 28 1998) at sec. 4.05 (Plaintiff's Exhibit 68)).

[194]    Flynn Decl. ¶ 20; Trial Tr. Vol. 1 43:13–44:5.

[195]    Shaked Rept. ¶ 137.

[196]    Tuliano Rept. 47 tbl.6.

[197]    Recovery Trust Post-Trial Br. 41.

even if Adelphia had technically violated its debt covenants, creditors would not necessarily have declared defaults (or would have waived them), and that Adelphia would not necessarily have been prevented from accessing capital markets, a point which Shaked acknowledged.[198]

The Recovery Trust also contended that Adelphia would be unable to access capital markets for *new* financing based on its leverage ratio. To support this, the Recovery Trust turned to Flynn. Flynn testified that "[a]lthough the financial markets had widespread enthusiasm for lending to the cable industry in 1999, markets were generally not comfortable with cable companies with leverage levels over 7.0–8.0x EBITDA."[199] But FPL disputed this, by noting Adelphia's continued access to credit markets to finance three acquisitions in 1999, despite its reported leverage ratio of 9.9x EBITDA.[200] And FPL also noted that Mediacom, a similar cable company, successfully completed an IPO and issued new debt between 1999 and 2001, despite leverage ratios at much higher levels—between 11.1x EBITDA and 17x EBITDA during that period.[201] FPL contended, therefore, that both debt and equity markets would not be closed to Adelphia simply by virtue of its high leverage ratio.

For the reasons discussed below, I agree with FPL with respect to this.

### (b) Ability to Sell Assets

The Recovery Trust also argued that Adelphia would not be able to sell assets, or grant liens on those assets, to satisfy its capital needs.[202] In his report, Shaked reviewed several of Adelphia's debt agreements, and covenants they contained, and determined that "[t]he

---

[198]   Trial Tr. Vol. 4 423:17–23.

[199]   Flynn Decl. ¶ 23.

[200]   Trial Tr. Vol. 1 41:12–44:5.

[201]   FPL Post-Trial Br. 40–41; Trial Tr. Vol. 1 59:10–61:10, 80:17–81:2, 73:21–74:7.

[202]   Plaintiff's Trial Mem. of Law 2, 44, Apr. 17, 2012, ECF No. 106 ("**Recovery Trust Pre-Trial Brief**");
Trial Tr. 7/25/2013 239:5–9.

combined effect of the limitations on the sale of assets in Adelphia's credit agreements and indentures made the sale of assets difficult and complicated, and especially so for a company as leveraged as Adelphia."[203]  But FPL disputed what Adelphia's debt covenants said.  FPL argued, to the contrary, that under Adelphia's debt covenants, Adelphia "had substantial flexibility to sell cable systems, if necessary, in order to deleverage,"[204] and that Adelphia could have sold ABIZ or Verto so long as it retained at least 660,000 subscribers.[205]

As noted below, I agree that Adelphia could have sold assets to provide sufficient capital if necessary.

### (c) Effect of Fraud on Access to New and Existing Sources of Capital

The Recovery Trust further argued that Adelphia's fraud, in combination with a lack of credit-worthiness, would preclude it from obtaining capital from new and existing sources. Specifically, the Recovery Trust argued that "a company that cannot support further borrowing based upon its weak credit statistics has an even lesser (read: impossible) chance of borrowing after it is revealed to have engaged in a massive fraud."[206]

The Recovery Trust based its argument on testimony by Shaked and Flynn.[207]  Both Shaked and Flynn expressed skepticism about the market's willingness to extend financing to Adelphia if its fraud were disclosed.[208]  Because they argued that capital markets would be closed to Adelphia, neither Shaked nor Flynn quantified the additional cost of borrowing

---

[203]    Shaked Rept. ¶ 171.

[204]    FPL Post-Trial Br. 37–38.

[205]    *Id.* 38.

[206]    *See* Recovery Trust Post-Trial Br. 42.

[207]    *See* Recovery Trust Post-Trial Br. 42 n.69.

[208]    Shaked Decl. ¶¶ 57, 60 (noting that if Adelphia's fraud were disclosed, its credit rating would likely be withdrawn and it would violate its existing debt covenants, making it difficult for Adelphia to obtain new financing."); Flynn Decl. ¶ 23 ("In my opinion, in 1999, the market would not have continued to extend financing at Adelphia's actual leverage levels, particularly after the disclosure that its financial statements were materially misstated as a result of fraud.").

Adelphia would experience as a result of its fraud.[209]  But Dr. David Tabak ("**Tabak**"), an

expert FPL called on the issue, testified that Adelphia would still be able to borrow, merely

experiencing an increased spread of 97.5 basis points[210] in its borrowing costs.[211]

Tabak further testified that disclosure of fraud would not necessarily have precluded

Adelphia's access to capital markets.[212]  Tabak examined an empirical study on access to

capital markets after disclosures of fraud, and also examined five large companies that had

disclosed fraudulent activity (Cendant, Waste Management, Rite-Aid, Enron, and

WorldCom), each of which was able to obtain financing after the disclosure.[213]  Tabak

concluded that "[t]he fact that all five of the companies examined obtained financing after

disclosing fraud strongly supports my conclusion and completely rebuts that of Prof. Shaked.

Even two companies with massive fraud, Enron and WorldCom, which I note Prof. Shaked

cited in his rebuttal report, obtained financing in the much more challenging 2001/2002

economic environment . . . ."[214]  Shaked countered that two of these companies (Cendant and

Waste Management) had lower leverage ratios than Adelphia, and that the confluence of

factors made Adelphia's financing impossible.[215]  But Tabak argued that a third company's

(Rite-Aid's) leverage ratio was higher.[216]  I harmonize this underlying evidence to find that

---

[209]   Shaked did calculate the increased WACC that he believed Adelphia would experience as a result of risk premia applied to its cost of debt and cost of equity, *see* p. 20 above, but he did not translate that to interest rate terms.

[210]   A basis point is 1/100 of a percent.  By way of example, an increased interest rate of 97.5 basis points would be a little less than 1%.

[211]   Written Direct Testimony of David Tabak, Ph.D. ¶ 35, Apr. 17, 2012, ECF No. 103 ("**Tabak Decl.**") (citing Tabak Rept. ¶¶ 18–20).

[212]   *Id.* ¶ 11.

[213]   *Id.* ¶ 14.

[214]   *Id.* ¶ 63.

[215]   Shaked Rebuttal Rept. ¶¶ 119–123.

[216]   Trial Tr. vol. 7, 812:8–813:16, 815:14–17, May 3, 2012, ECF No. 118 ("**Trial Tr. Vol. 7**").

fraud, at least at the lower level present at Adelphia before the co-borrowing facilities were put in place, would not necessarily result in an inability to access capital, and would not have done so here.

### 3. My Capital Adequacy Conclusions

#### (a) Capital Needs

The unavailability and unreliability of management and contemporaneous analyst projections presented challenges in the capital adequacy analysis similar to those I faced in the solvency analysis. But here, each of the experts had no choice but to utilize cash flow projections to determine Adelphia's capital needs in the short-term. Though I remain troubled that the projections made by each side were in significant respects speculative, I have no choice either. Because cash flow projections are so important to the capital adequacy analysis, I consider them as well, though with a fair degree of scrutiny.

I accept Tuliano's assumptions regarding Adelphia's true number of subscribers. I also accept his consolidation of Olympus cash flow for purposes of the capital adequacy analysis because the fact that Olympus would provide useful cash flow was probable in January 1999, and became a reality on October 1, 1999, the date from which Tuliano included it. However, as in my solvency analysis, [217] I reject Tuliano's inclusion of the portion of the 1999 equity issuance that was used to pay down Olympus debt, because I do not believe there was a dollar-for-dollar relationship between the paydown of Olympus debt and the price ultimately paid for Olympus, nor, of course, with respect to any cash flow Olympus might provide. And as in my solvency analysis with respect to receivables owing from the Rigas Family Entities, [218] I cannot accept Tuliano's view with respect to the intercompany

---

[217]    *See* pp. 43–44 above.

[218]    *Id.*

receivable that would be issued by Hilton Head, one of the Rigas Family Entities, as a result of Adelphia's paydown of Hilton Head debt from the equity proceeds.  Instead, I consider it inappropriate to include that portion of the equity issuance in Adelphia's cash flow projections.

Capital expenditures based on upgrades of Adelphia's systems provided an easier issue in connection with Adelphia's cash flow projections.  I did not regard the analysis by either Flynn or Dippon to be unreasonable.  But I think Dippon was correct in challenging Flynn's and Shaked's assumptions that Adelphia would have to completely upgrade over just a three-year time period.  I have little doubt that upgrading would boost revenues, and be desirable.  But I was not persuaded as to the asserted urgency of upgrading.  Adelphia was subject to only limited competition within the markets in which it did business; I was not persuaded that competition from satellite would place significant pressure on Adelphia to upgrade its service.  And also of significance to me was the fact that Flynn herself acknowledged that other similar companies were not 100% upgraded by 2001, and in fact were only in the range of 80–90% upgraded.  In light of that evidence, while I accept as true that Adelphia was not as upgraded as other multi-service operators, I easily find that there was no need for Adelphia to so promptly undertake such an upgrade plan.

Though I could not determine with precision the exact amount of Adelphia's capital need between 1999 and 2001, I believe, and find, that it would be in the range of $600 million, a figure between the estimates provided by FPL and Adelphia.

### (b) Access to Capital Markets

Gauging ability to access capital markets presented the most challenging issues in analyzing capital adequacy.  Doing so required me to predict how markets would react if Adelphia's fraud and true financial metrics were disclosed at the time of the Stock

-59-

Repurchase, an exercise which is unavoidably somewhat speculative.  And the expert

testimony as to this was in sharp conflict.  But ultimately I find that the Recovery Trust failed

to meet its burden in proving that capital markets would be closed to Adelphia if Adelphia's

fraud, which was in its infancy in 1999, was disclosed.

The Recovery Trust argued that the confluence of three factors—Adelphia's leverage

ratio, its encumbered assets, and fraud—would cause the capital markets to be closed off to

Adelphia.  But after hearing FPL's evidence as to this, I was unpersuaded by the Recovery

Trust's contentions in this regard.   Preliminarily, the Recovery Trust did not even argue that

any of the factors in isolation would cause capital markets to be closed to Adelphia.  The

Recovery Trust instead relied on those factors in combination.  But (especially in light of

Mediacom's ability to raise equity capital with a much higher leverage ratio, and the evidence,

which I accept, that Adelphia could sell assets) I don't believe that the first two factors

(leverage ratio and encumbered assets) would present material impediments, and that those

two factors would be sufficient, even when piled on with the third (which was the most

significant), to cause Adelphia to have been unable to raise capital.

Ultimately, the most persuasive aspect of FPL's position was its analysis of other

companies facing a similar confluence of factors.  In particular, Tabak's analysis of five

companies facing similar situations (especially Rite-Aid, which was also highly leveraged)

was persuasive; it showed how markets actually reacted to fraud at large public companies.

Also, but importantly, Adelphia's fraud in 1999 was much less extensive than the fraud that

had infected the company by 2002.  For that reason, I find Shaked's heavy reliance on the

outcome of Adelphia's fraud disclosures in 2002 to be flawed.  And indeed, Adelphia could

even secure financing upon the June 2002 filing of its chapter 11 case (part of which financing was used for CapEx), after the much more serious fraud at Adelphia had become known.[219]

For all of these reasons, I find that the Recovery Trust did not meet its burden of proof in demonstrating that Adelphia lacked adequate capital at the time of the Stock Repurchase.

C.

Equitable Insolvency

The Recovery Trust did not try to show that in 1999, at the time of the Stock Repurchase, Adelphia was "equitably insolvent"—*i.e.*, unable to pay its debts as they matured. Nor did the Recovery Trust try to show that Adelphia entered into the Stock Repurchase intending that it would be unable to pay its debts, or on notice that such would be the result. To the extent that the Recovery Trust might have desired findings of that character, it failed to meet its burden of proof in that regard.

I cannot, and do not, find that Adelphia was equitably insolvent at the time of the Stock Repurchase, or that the Stock Repurchase made it so.

IV.

Ultimate Findings of Fact

For reasons set forth above and in the Discussion below, I find:

(1) The Stock Repurchase and Redemption were separate transactions, inappropriate for collapsing with each other.

(2) Adelphia was not insolvent at the time of the Stock Repurchase, nor did the Stock Repurchase make it so.

---

[219]    *See* Interim Order Authorizing Post-Petition Financing, June 28, 2002, Umbrella ECF No. 51; Final Order Authorizing Post-Petition Financing, Aug. 23, 2012, Umbrella ECF No. 525.

(3) Adelphia was not left with inadequate capital at the time of the Stock

Repurchase, nor did the Stock Repurchase leave it so.

(4) Adelphia was not equitably insolvent at the time of the Stock Repurchase,

nor did the Stock Repurchase make it so.

### Discussion

Under familiar principles, a trustee or one with the rights of a trustee may bring

fraudulent transfer claims on behalf of an estate to avoid a transfer when avoidance could be

obtained under state law by an entity that was a creditor at the time of the transfer.[220]  If the

transfer is avoided, the transferred property is recoverable for the benefit of the estate.[221]  The

plaintiff bears the burden of proving, by a preponderance of the evidence, each element of a

constructive fraudulent transfer claim.[222]

---

[220]    Bankruptcy Code section 544(b)(1).  It provides, with an exception not relevant here:

> [T]he trustee may avoid any transfer of an interest of the debtor in
> property or any obligation incurred by the debtor that is voidable
> under applicable law by a creditor holding an unsecured claim that
> is allowable under section 502 of this title or that is not allowable
> only under section 502(e) of this title.

[221]    Section 550(a) of the Code provides, in relevant part, and with exceptions not relevant here:

> [T]o the extent that a transfer is avoided under section 544 . . . , the
> trustee may recover, for the benefit of the estate, the property
> transferred, or, if the court so orders, the value of such property,
> from—
>
>> (1) the initial transferee of such transfer or the entity for
>> whose benefit such transfer was made . . . .

I did not have to consider the extent to which FPL would be protected by the "Safe Harbor" of
Bankruptcy Code section 546(e), since that potential defense was not timely asserted by FPL's former
counsel.  *See Adelphia Recovery Trust v. FLP Group, Inc. (In re Adelphia Commc'ns Corp).*, 452 B.R.
484, 492–93 (Bankr. S.D.N.Y. 2011) (Gerber, J.).

[222]    *See Glassman v. O'Brian (In re Valley Bldg & Constr. Corp.)*, 435 B.R. 276, 287–88 (Bankr. E.D. Pa.
2010) (Fitzsimon, J.); *Leibersohn v. Campus Crusade for Christ, Inc.*, 280 B.R. 103, 115 (Bankr. E.D.
Pa. 2002) (Carey, J.).

Though in the respects relevant here, there is little difference in the fraudulent transfer law of most, if not all, of the states[223] (and, for that matter, the similar fraudulent transfer provisions that exist under section 548 of the Bankruptcy Code).  I apply Pennsylvania law, the law of the jurisdiction where the alleged injury was suffered and that has the greatest interest in this controversy.[224]

Putting together Pennsylvania's two relevant statutory provisions[225] with the Bankruptcy Code's sections 544 and 550, the Recovery Trust can prevail here if it shows (1) that the transfer in question—*i.e.*, the Stock Repurchase—was for less than reasonably

---

[223]    *See Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 503 B.R. 348, 356 n.13 ("State fraudulent transfer law is largely, but not entirely, the same throughout the United States; the Uniform Fraudulent Transfer Act ("**UFTA**") has been enacted in 43 of the states, though two (including New York) still use the older Uniform Fraudulent Conveyance Act ("**UCFA**"), and five others have idiosyncratic statutes or rely on common law.").

[224]    Pennsylvania is one of the 43 states in the nation that has enacted the UFTA.

[225]    The first, 12 PA. CONS. STAT. § 5104 (2014), provides, in relevant part, with respect to transfers fraudulent as to present and future creditors:

> A transfer made  . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made  . . . , if the debtor made the transfer . . . :
>
> . . .
>
> (2) *without receiving a reasonably equivalent value in exchange* for the transfer . . . , and the debtor:
>
>> (i)  was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor *were unreasonably small* in relation to the business or transaction; or
>>
>> (ii)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts *beyond the debtor's ability to pay as they became due*.

The second, 12 PA. CONS. STAT. § 5105 (2014), provides, in relevant part, with respect to transfers fraudulent as to present (but not future) creditors:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and *the debtor was insolvent* at that time or the debtor became insolvent as a result of the transfer or obligation.

(Emphasis added in each instance).

equivalent value in exchange, and (2) that it took place when Adelphia (a) was insolvent, or

would be rendered such; (b) would be left with unreasonably small capital; or (c) intended to

incur (or reasonably should have believed it would incur) debts beyond Adelphia's ability to

pay them as they became due.

Here, the Recovery Trust seeks to recover the $150 million Stock Repurchase by

showing compliance with those requirements. FPL defends this action making two principal

contentions. First, FPL challenges the propriety of considering the Stock Repurchase

independently of the Redemption, about eight months later—contending that the transactions

were integrated (and for that reason, I should "collapse" and consider them as one)— and FPL

contends that when the two transactions are collapsed, it provided reasonably equivalent value

in exchange for Adelphia's payments. Second, FPL challenges the Recovery Trust's assertion

that Adelphia was insolvent, inadequately capitalized, or equitably insolvent at the time of the

transfer. I consider these issues in turn.

## I.

### Interdependence

Determination of reasonably equivalent value starts with whether the Stock

Repurchase and the Redemption should be collapsed and considered as a single transaction.

This preliminary issue bears on what "transfer" I should analyze under fraudulent transfer law

for the purpose of determining whether reasonably equivalent value was paid.

FPL frames the transaction as one in which Adelphia paid FPL approximately

$257 million for the *aggregate* of the Stock Repurchase and the Redemption. The Recovery

Trust contends, on the other hand, that the Stock Repurchase and Redemption were two

separate transactions—one in which Adelphia paid the $150 million for the repurchase of

Adelphia's own stock, and another in which Adelphia paid $108 million to redeem FPL's interest in Olympus.

It is not infrequently appropriate, as FPL advocates, to "collapse" a series of transactions for fraudulent transfer analysis.[226] "Courts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction."[227] The paradigmatic example of such is a leveraged buyout ("**LBO**").[228]  But I find the facts here to be very different than those of an LBO.  And as a mixed question of fact and law, I find no basis for collapsing here.

While the Pennsylvania Supreme Court has not addressed the issue of collapsing multiple transactions for determining reasonably equivalent value under Pennsylvania's

---

[226]   *See Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 370–71 (Bankr. S.D.N.Y. 2002) (Gonzalez, J.) ("**Sunbeam**").

[227]   *Id.* at 370.

[228]   *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) ("**HBE Leasing**") ("It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the UFCA.  This approach finds its most frequent application to lenders who have financed leveraged buyouts of companies that subsequently become insolvent." (citation omitted)).

In an LBO, two or more transactions are executed substantially contemporaneously or in rapid succession to effect the purchase of a target company using its own assets as security for financing.  In the "paradigmatic scheme," "one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee.  The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing."  *Id.*

While in the first component of the transaction, the debtor receives reasonably equivalent value, in the second, the debtor does not.  If considered separately, only the second transaction would raise fraudulent transfer concerns, even though the entire scheme could seriously injure the debtor's preexisting creditors.

For this reason, courts have found it appropriate to look beyond the individual components of multi-component transactions and focus instead on the overall picture.  *See, e.g.*, *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986) ("**Tabor**") (affirming district court's decision to "look[] beyond the exchange of funds" and collapse transactions that "were part of one integrated transaction").  FPL asks me to do so here.

versions of the UFTA or the older UFCA, several federal courts have.  The best known of these decisions is the Third Circuit's frequently cited opinion in *Tabor*, construing the Pennsylvania version of the earlier UFCA.[229]  The *Tabor* court rejected contentions that the UFCA didn't apply to LBOs;[230] agreed that the LBO should be collapsed for analytical purposes;[231] and ultimately affirmed a district court ruling that the LBO was a fraudulent transfer.[232]

*Tabor* considered a number of factors in determining when transactions should be collapsed for analytical purposes, but did not, in so many words, list them.  But later cases, relying on *Tabor*, have done so.[233]  The *Hechinger* court (relying not just on *Tabor*, but also on the Second Circuit's decision in *HBE Leasing*) stated that it would focus "not on the structure of the transaction but the knowledge and intent of the parties involved in the

---

[229]    *Tabor*, 803 F.3d at 1295–96.

[230]    *Id.* at 1297.

[231]    *Id.* at 1302–03.

[232]    *Id.* at 1296.

[233]    *See In re Hechinger Inv. Co. of Delaware*, 327 B.R. 537, 546–47 (D. Del. 2005) (Robinson, C.J.) ("**Hechinger**"); *Mervyn's LLC  v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R 96, 104 (Bankr. D. Del. 2010) (Gross, J.) ("**Mervyn's**"); *In re Tribune Co.*, 464 B.R. 126, 165 (Bankr. D. Del. 2011) (Carey, J.) ("**Tribune**").  Each of *Hechinger*, *Mervyn's* and *Tribune* involved analysis of the closely similar Bankruptcy Code section 548.

Though developed and principally applied in the LBO context, these factors have also been applied in other contexts.  *See, e.g.*, *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F. 2d 206, 212–13 (3d Cir. 1990) ("**Voest-Alpine**") (applying *Tabor* Factors in context of a series of transactions transferring assets between related companies); *Sher v. SAF Financial, Inc.*, 2009 U.S. Dist. LEXIS 129948, at *20, 2010 WL 4034272, at *7  (D. Md. Oct. 14, 2010) (Bennett, J.) ("**Sher**") (finding *Tabor* Factors "instructive" in context of alleged plan to distribute bonus payments);  *In re National Forge Co.*, 344 B.R. 340, 347–51 (W.D. Pa. 2006) (McLaughlin, J.) ("**National Forge**") (noting *Tabor* Factors are "instructive and consistent with the principles of the 'integrated transaction' doctrine" in context of stock redemption and settlement payment); *Protocomm Corp. v. Novell, Inc.*, 55 F. Supp. 2d 319, 327 (E.D. Pa. 1999) (Reed, J.) ("**Protocomm**") (finding *Tabor* Factors "equally applicable" in case where company allegedly undertook stock acquisition as part of a plan to place assets out of creditor's reach); *In re Syntax-Brillian Corp.*, 2011 WL 3101809, at *11–12 (Bankr. D. Del. July 25, 2011) (Shannon, J.) ("**Syntax-Brillian**") (applying *Tabor* Factors where debtors disbursed proceeds from credit lines to insider corporation); *Sunbeam*, 284 B.R. 355, 370–72 (considering collapsing where lenders issued secured loan and debtor subsequently used loan proceeds to acquire corporate entities).

transaction."[234]  Decisions in this district similarly speak of "the knowledge and intent of the

parties in the transaction."[235]  *Mervyn's*, citing *Tabor* and *Hechinger*, spoke of courts

considering three factors in their analysis:

>  (1) whether all of the parties involved had knowledge of the
>
>     multiple transactions;
>
>  (2) whether each transaction would have occurred on its own;
>
>     and
>
>  (3) whether each transaction was dependent or conditioned on
>
>     other transactions.[236]

*Tribune*, citing *Mervyn's*, did likewise.[237]  Thus I focus on the "knowledge and intent" of the

parties in the transaction, as articulated in *Best Products*, *Sunbeam*, and *Hechinger*, and on the

three factors identified in *Mervyn's* and *Tribune*.

The "knowledge and intent" factor (which overlaps, in part, with the first of the

*Mervyn's-Tribune* factors) cuts to a certain extent in each direction, but on balance strongly

favors a ruling that declines to collapse.  When the Stock Repurchase took place, FPL and

Adelphia knew that they also contemplated a redemption, of some kind, of Telesat's interest

in Olympus.  But they also knew that, unlike the Stock Repurchase, the redemption was not

scheduled to occur immediately; that the terms of the redemption were not then finalized; and

that the redemption might be total or that it might be only partial.[238]  They knew that the Stock

---

[234]   *Hechinger*, 327 B.R. at 546 (internal quotation marks omitted).

[235]   *See Sunbeam*, 284 B.R. at 370 (citing *In re Best Products Co.*, 157 B.R. 222, 229 (Bankr. S.D.N.Y. 1993) (Brozman, C.J.)).

[236]   *Mervyn's*, 426 B.R. at 104.

[237]   *Tribune*, 464 B.R. at 165.

[238]   *See* pp. 8–9 above.

Repurchase had not been made contractually contingent on the resolution of the open matters

related to the Olympus Redemption.

Along with the evidence of FPL's and Adelphia's *knowledge* (which to a limited

extent would support collapsing, but which to a greater extent would support declining to

collapse) is the strong evidence of their *intent*—which was not to make the two transactions

dependent on each other.  As I noted previously in my Findings of Fact, nothing in the Letter

Agreement made the transactions contingent upon one another.[239]  The Letter Agreement did

not provide that if the Redemption failed to occur, the Stock Repurchase (which would have

taken place substantially earlier) would be unwound.  And neither transaction was reliant

upon the other for its terms, nor did it have the purpose of facilitating the other.  The purchase

price for the Redemption in no way related to the price for the Stock Repurchase, or vice

versa.  Each transaction could have occurred on its own, and indeed, each was set to occur on

its own, independently, and at different times.  The Board Minutes (after referring in a recital

to the Letter Agreement, and a defined term, the "Telesat Transaction," which had two

components) authorized the "Telesat Transaction" in a single paragraph, but without saying

that either component was dependent on the other.  And when Coyle testified at the criminal

trial (when he did not yet have an interest in the outcome), he described the two transactions

as separate.[240]  The FPL 10-K for 1998 described the Stock Repurchase and Olympus

Redemption as separate transactions (noting that the latter was "in addition"), and noted that

---

[239]     *See* p. 10 above.

[240]     It is true that in Adelphia's press release, it referred to "an agreement" in the singular, embodying both
aspects of the Adelphia-FPL transactions, *see* p. 13 above, which cuts in the other direction.  But the
press release does not refer to the two aspects of the transaction as interdependent or manifest an intent
that one turn on the consummation of the other.

the terms of the latter had not yet been finalized.  And the FPL 10-K for 1999, though less clearly, was to the same effect, referring there to "both investments."

The first of the three *Tabor* factors has already been addressed.  The second and third *Tabor* factors deal, in various ways, with the interdependence of the transactions.  The second focuses on the unwillingness of the parties to undertake any of the steps of the purportedly integrated transaction without the others,[241] and the third deals with the interdependence of each transaction's terms.[242]

Turning to those second and third factors, I note that three documents governed the Stock Repurchase and the Redemption:  the Letter Agreement, the Stock Purchase Agreement, and the Redemption Agreement.  Here, nothing in the three documents governing the transactions suggested that the parties intended the transactions to be integrated.  I conclude instead that they were simply different transactions toward similar ends.

Of the three agreements governing the Stock Repurchase and the Redemption, the Letter Agreement was the only document to reference both transactions.  It stated, in that regard:

> Simultaneously with the execution of the documentation
> for the purchase of the Adelphia shares or thereafter
> from time to time, the parties will execute a power of

---

[241]   *See Allstate Insurance Co. v. Countrywide Financial Corp.*, 842 F. Supp. 2d 1216, 1233 (C.D. Cal. 2012) (Pfaelzer, J.) ("***Allstate***") (finding "[f]actor two is arguably present" where it was "unlikely" that defendant would have completed the first step of the allegedly integrated transaction if it were unable to also complete the second step); *Hechinger*, 327 B.R. at 547 (collapsing transactions where "[e]ach step of the Transaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent"); *National Forge*, 344 B.R at 350 (finding second factor was present where "[f]or example, [debtor] would not have sought to borrow the additional $4 million from the Lenders (and the Lenders would not have lent those monies) if not for the purpose of financing the stock redemption.").

[242]   *See Allstate*, 842 F. Supp. 2d at 1233 ("[F]actor three is not present.  The merger was not contingent on the asset sales, nor vice versa."); *see also Tribune*, 464 B.R. at 166 ("I am not willing to dispense with the third factor in the particular collapsing question at issue here (i.e. for purposes of determining solvency rather than reasonably equivalent value). . . .  [I]f the Step One transactions could stand on their own as of the closing of Step One, then it is not appropriate to collapse the steps for determining solvency at that time.").

-69-

> attorney in favor of, or other documentation reasonably
> requested by, Olympus so that Olympus may
> consummate the redemption without any further action
> on the part of Telesat.

But it also provided that FPL would have the option to submit a plan for a *partial* redemption

of its Olympus interest, which could occur instead of the full redemption.[243]  The fact that at

the time that the Letter Agreement was signed, the parties were unsure of the extent of the

Redemption, but the Stock Repurchase was scheduled to occur regardless and in full, tends to

indicate that full completion of both aspects of the transaction was unnecessary for the

transaction to achieve its desired effect.  Because the Letter Agreement contemplated that a

mere partial redemption could have occurred, the Letter Agreement suggests that the parties

did not intend that the transactions be truly integrated.

The two other agreements executed by the parties relating to the Stock Repurchase and

the Redemption were the Stock Purchase Agreement and the Redemption Agreement, which

were undertaken after the Letter Agreement.  Neither of those agreements mentioned the other

transaction, and the agreements were not cross-conditioned in any way.  Further, neither

provided any indication that the transactions were intended to rely upon one another.

In the face of all this, FPL points to several other facts which it argues support a

conclusion that the transactions should be collapsed.  First, FPL points to the fact that "[b]oth

steps were negotiated simultaneously by the same individuals."[244]  That is true, but is

unpersuasive without more.  Second, FPL argues that because "FPL Group would not have

agreed to do one step in the integrated transaction without the other," the Stock Repurchase

---

[243]    Letter Agreement ("Telesat shall have until July 11, 1999, to present a plan of partial redemption to
Adelphia for Adelphia's approval.  Adelphia will use its reasonable business judgment in evaluating any
plan submitted by Telesat.").

[244]    FPL Post-Trial Br. 54.

and the Redemption should be viewed as a single integrated transaction.[245]  But that rests on

Coyle's testimony alone—and I find Coyle's testimony to be unworthy of acceptance—

because  it was so obviously self-serving, contradicted by his previous testimony in the Rigas

criminal trial (when he had less of a motivation to spin the facts his way), and contradicted by

the bulk of the documents.

Then, FPL argues that because the initial purchase of one million shares of Adelphia's

common stock was integrally related to FPL's involvement in the Olympus Partnership (and

indeed a "sine qua non" to Adelphia's willingness to enter into the Olympus Partnership)[246]

the transactions reversing them must have *also* been integrally related—what Coyle suggested

was "two steps in, two steps out."  I disagree.  Indeed the fact that Adelphia and FPL could

(and did) draft to make the interdependence clear at the outset of their dealings suggests to me

that they did not have the like intention at the end.

FPL then points to an additional fact which occurred after the Letter Agreement was

signed, which it suggests supports collapse.  FPL argues that the fact that Adelphia's Board

"reviewed and approved of both transactions in the same board meeting" supports the notion

that the parties viewed the transactions as integrated.[247]  But just as it is plausible that the

same individuals would negotiate even completely separate transactions at the same time, the

fact that the Board considered both the Stock Repurchase and the Redemption at the same

time does not, without more, tend to support a finding that the transactions were integrated or

dependent on each other.

---

[245]        *Id.* 54–55.

[246]        FPL Pre-Trial Br. 8–9 ("As a sine qua non to this transaction, at [Adelphia's] insistence, Telesat also
             purchased one million shares of [Adelphia] Class A Common Stock . . .").

[247]        FPL Post-Trial Br. 54–55.

Finally, FPL argues that the evidence presented "conclusively established the parties' 'knowledge and intent' in this case; namely that each side to the transaction (i) intended to terminate the parties' mutual business relationship, (ii) knew the counterparty had the same goal, and (iii) viewed the Stock Repurchase and Olympus Redemption as one integrated transaction with two steps."[248]  And FPL goes on to assert that "the parties' mutual knowledge and intent in this case is sufficient, by itself, to integrate the Stock Repurchase and Olympus Redemption."[249]

I cannot agree.  The expectation that another transaction would take place falls far short of establishing an intent that the two transactions would be interdependent or otherwise linked.  And most of the other indicia run in the opposite direction.  I don't doubt that when Adelphia and FPL entered into the Letter Agreement, they shared a mutual goal to end their relationship, and that each of the Stock Repurchase and Redemption furthered that goal.  But I cannot find based on the facts presented to me, that the parties intended to execute the two transactions as a single *integrated* one—especially when they took place eight months apart.  As described above, for transactions to be integrated and interdependent, the parties must intend that the individual transactions in the series rely upon one another to achieve the desired effect.  I cannot find that the parties so intended here.

\* \* \*

If satisfied that the transactions should be integrated, I would then consider whether Adelphia received reasonably equivalent value in exchange for its payment of everything it laid out, including the $150 million it paid incident to the Stock Repurchase.  But I have determined that the premise for undertaking such an inquiry fails.  Here, FPL understandably

---

[248]     FPL Post-Trial Br. 52.

[249]     *Id.* 54.

does not dispute that Adelphia did not receive reasonably equivalent value when it

repurchased its own stock.  I then turn to the real issue in this adversary proceeding:  whether

Adelphia was, or became, insolvent, inadequately capitalized, or equitably insolvent at the

time of the Stock Repurchase or because of it.

## II.

### Insolvency

The parties do not dispute the legal standards with respect to insolvency.  Under

Pennsylvania law, a debtor is actually insolvent "if, at fair valuations, the sum of the debtor's

debts is greater than all of the debtor's assets," commonly referred to as "balance sheet

insolvency."[250]  Fair value, in the context of a going concern, is measured by "the fair market

price of the debtor's assets that could be obtained if sold in a prudent manner within a

reasonable period of time to pay the debtor's debts."[251]

Insolvency is a question of fact, and a court has broad discretion when considering

evidence to support a finding of insolvency.[252]  Though courts must determine solvency free

of impermissible hindsight, courts may consider information "originating subsequent to the

---

[250]   12 PA. CONS. STAT. § 5102; *In re Fidelity Bond and Mortg. Co.*, 340 B.R. 266, 288 (Bankr. E.D. Pa.
2006) (Carey, J.) (referring to "the 'balance sheet test' for insolvency").

[251]   *In re Roblin Indus., Inc.*, 78 F.3d 30, 35 (2d Cir. 1996) ("**Roblin Industries**"); *see In re Coated Sales,
Inc.*, 144 B.R. 663, 667 (Bankr. S.D.N.Y. 1992) ("**Coated Sales**") (citing *Jahn v.
Reading Body Works, Inc. (In re Fassnacht & Sons, Inc.)*, 45 B.R. 209, 217 (Bankr. E.D. Tenn. 1984));
*In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 110–11 (Bankr. S.D.N.Y. 1999) (Garrity, J.)
("**Adler**").

In extreme cases of fraud, liquidation value, rather than going concern value, may appropriately be used
in determining solvency.  Here, neither party advocated use of liquidation value and I agree that here,
the extent of fraud at Adelphia does not rise to the level where use of liquidation value would be
appropriate.  *See Adler*, 247 B.R. at 111 ("[W]here a company is on its 'deathbed', we will value its
assets according to what could be obtained at a liquidation sale and not give them a 'going concern
value.'"); *In re Art Shirt Ltd.*, 93 B.R. 333, 341 (E.D. Pa. 1988) ("[A] business does not have to be
thriving to receive going concern valuation.  Before the going concern valuation is to be abandoned, the
business must be 'wholly inoperative, defunct or dead on its feet.'" (citation omitted) (quoting *In re
Bellanca Aircraft Corp.*, 56 B.R. 339, 387 (Bankr. D. Minn. 1985))).

[252]   *See Roblin Industries*, 78 F.3d at 35.

transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability

as of the pertinent date," which assures that the valuation is based in reality.[253]  Subsequent

discovery of fraud is appropriately considered when determining the real financial condition

of the company at the time of the transfer.[254]

In this case I have found that fraud had already begun at Adelphia at the time of the

Stock Repurchase, but the fraud at Adelphia was of a much lesser degree than at the later time

that the co-borrowing arrangements came into place and thereafter.  More fundamentally, I

have found, as facts, that the Shaked valuation was unpersuasive, and that the Tuliano

valuation, while also flawed in several respects, came closer to my views as to the appropriate

methodology and conclusions.

For the reasons set forth in my Findings of Fact, I conclude that the Recovery Trust

did not meet its burden of proof in showing that Adelphia was insolvent at the time of the

transfer.

## III.

## Inadequate Capital and Equitable Insolvency

The parties likewise do not dispute the applicable legal standard regarding capital

adequacy.  Under Pennsylvania's enactment of the UFTA, a company lacks adequate capital if

its assets are unreasonably small in relation to its business.[255]  Courts considering capital

adequacy (under state law or Bankruptcy Code section 548, which affords analogous rights of

---

[253]    *Coated Sales*, 144 B.R. at 668 (quoting *In re Chemical Separations Corp.*, 38 B.R. 890, 895 (Bankr. E.D. Tenn. 1984)); *see Adler*, 247 B.R. at 111 ("We may consider evidence uncovered after the advent of bankruptcy to determine the value of the debtor's assets at the time the alleged insolvency occurred.").

[254]    *See Coated Sales*, 144 B.R at 668 (considering the effect of fraud on the going concern value of the company).

[255]    12 PA. CONS. STAT. § 5104.

recovery in favor of estate representatives under federal law) have generally considered

whether, at the time of the transfer, the company was able to generate sufficient profits or

capital to sustain operations over a reasonable period of time.[256]  In doing so, they have

considered the reality of the debtor's financial condition leading up to the transfer, looking to

such factors as the company's "debt to equity ratio, its historical capital cushion, and the need

for working capital in the specific industry at issue,"[257] as well as "the debtor's present and

prospective debts, and whether the retained assets are sufficiently liquid to enable the debtor

to pay such debts as they become due.'"[258]  But "[w]hile a company must be adequately

capitalized, it does not need resources sufficient to withstand any and all setbacks."[259]

Here I have found as a fact, and now find as a mixed question of fact and law, that

Adelphia was not left with inadequate capital.

In *Moody*, the Third Circuit, deciding a case under Pennsylvania's now-superseded

UFCA,[260] concluded, in the context of earlier differing judicial views on the subject, that "the

better view is that inadequate capital denotes a financial condition short of equitable

insolvency."[261]  The *Moody* court understood the latter to occur when a company is unable to

---

[256]     *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1069–70 (3d Cir. 1992) ("***Moody***"); *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 118–19 (E.D. Pa. 2011) ("***Rocky Mountain***") ("The 'unreasonably small assets' test set forth in subsection (a)(i) does not require insolvency but rather an 'inability to generate sufficient profits to sustain operations.'" (quoting *In re Fidelity Bond and Mortg. Co.*, 340 B.R. 266, 294 (Bankr. E.D. Pa. 2006))).

[257]     *In re Iridium Operating LLC*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) (Peck, J.) ("***Iridium***") (quoting *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (Francis, M.J., hearing case and directing entry of final judgment on 28 U.S.C. § 636(c) consent) ("***MFS***")).

[258]     *Rocky Mountain*, 782 F. Supp. 2d at 119 (quoting 12 PA. CONS. STAT. § 5104 cmt. 4).

[259]     *Iridium*, 373 B.R. at 345 (quoting *MFS*, 910 F. Supp. at 944).

[260]     Pennsylvania replaced its version of the UFCA with its version of the UFTA in 1993, and the UFTA applies to the transaction at issue here.

[261]     *Moody*, 971 F.2d at 1070.

pay obligations as they become due.[262]  Textual analysis of Pennsylvania's superseding

UFTA, insofar as it carries over the equitable insolvency concept, suggests that the newer

statute requires a focus on the debtor's *intent and belief* (including, in the latter case,

constructive belief) with respect to its incurrence of debt, as contrasted to a focus on financial

condition alone.[263]  But that does not necessarily mean that the *Moody* analysis was

legislatively overruled in any way, and in any event, any distinctions in this regard do not

matter; the Recovery Trust here does not separately argue that Adelphia was equitably

insolvent, but instead focuses on insolvency and capital adequacy.[264]

For this reason, and because I do not find that Adelphia lacked adequate capital (a

financial condition which is less severe than equitable insolvency), I cannot and do not find

that Adelphia was equitably insolvent, either.

## Conclusion

I find that the Stock Repurchase and later purchase of the Olympus Partnership interest

were not interdependent, and that Adelphia received no value when it spent $150 million for

the buyback of its stock.  But I nevertheless find that while Adelphia was plainly insolvent

when it entered into the later co-borrowing facilities (or was rendered insolvent as a

consequence of them), the Recovery Trust failed to meet its burden to show that Adelphia was

insolvent, or rendered insolvent, at this earlier time.  Likewise, the Recovery Trust failed to

---

[262]     *Id.* ("Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable solvency.").

[263]     *See* 12 PA. CONS. STAT. § 5104(a)(2)(ii) (a transfer would be fraudulent if the debtor, without receiving a reasonably equivalent value in exchange for the transfer, "*intended* to incur, or *believed or reasonably should have believed that* the debtor would incur, debts beyond the debtor's ability to pay as they became due" (emphasis added)).

[264]     *See* Recovery Trust Pre-Trial Br. 45 ("Neither party's experts separately addressed equitable insolvency in their reports, but instead included that analysis in their discussions of capital adequacy."); *accord* FPL Post-Trial Br. 34.

meet its burden to show that the Stock Repurchase left Adelphia with inadequate capital, or rendered Adelphia equitably insolvent. Thus judgment should be entered in favor of the Defendants.

This Decision after Trial should be deemed to constitute *proposed* Findings of Fact and Conclusions of Law. In accordance with Fed.R.Bankr.P. 9033, and Local Bankruptcy Rule 9033-1, the bankruptcy court clerk will serve copies of this Decision after Trial on all parties by mail. Parties are reminded that under Fed.R.Bankr.P. 9033(b), they should file with the clerk any objections they might have to these findings within 14 days after being served, stating the grounds for such objection, as the first step to effect any desired district court *de novo* review.

Dated: New York, New York        **_s/Robert E. Gerber_**
       May 6, 2014                      United States Bankruptcy Judge

## APPENDIX A

| Line | Item | [A] Recovery Trust Expert (DCF) | [1] FPL Expert (Comparable Companies) | [2] FPL Expert (Precedent Transactions) | [3] FPL Expert (Valuation Conclusion) | Range Of Court's Findings High | Range Of Court's Findings Low |
|---|---|---|---|---|---|---|---|
| 1 | **Starting TEV** | $ 2,538,254,000 | $ 4,471,693,000 | $ 4,844,770,000 | $ 4,658,231,500 | $ 4,471,693,000 | $ 4,844,770,000 |
|  | Add Control Premium | $ 0 | $ 376,370,000 | $ 0 | $ 188,185,000 | $ 376,370,000 | $ 0 |
|  | Subtotal | $ 2,538,254,000 | $ 4,848,063,000 | $ 4,844,770,000 | $ 4,846,416,500 | $ 4,848,063,000 | $ 4,844,770,000 |
|  | Add Cash | $ 0 | $ 156,074,000 | $ 156,074,000 | $ 156,074,000 | $ 156,074,000 | $ 156,074,000 |
|  | Subtotal | $ 2,538,254,000 | $ 5,004,137,000 | $ 5,000,844,000 | $ 5,002,490,500 | $ 5,004,137,000 | $ 5,000,844,000 |
| 2 | **Adjustments to Starting TEV (All Additions):** [B] |  |  |  |  |  |  |
| 3 | (1) Verto Acquisition | $ 0 | $ 135,143,000 | $ 135,143,000 | $ 135,143,000 | $ 135,143,000 | $ 135,143,000 |
| 4 | (2) Olympus Partnership Interest | $ 216,000,000 | $ 318,000,000 | $ 318,000,000 | $ 318,000,000 | $ 216,000,000 | $ 216,000,000 |
| 5 | (3) Value of ABIZ | $ 0 | $ 642,078,000 | $ 642,078,000 | $ 642,078,000 | $ 0 | $ 0 |
| 6 | (4) Receivable from Olympus | $ 0 | $ 279,084,000 | $ 279,084,000 | $ 279,084,000 | $ 279,084,000 | $ 279,084,000 |
| 7 | (5) Receivable from Rigas Family Entities | $ 0 | $ 279,121,000 | $ 279,121,000 | $ 279,121,000 | $ 0 | $ 0 |
| 8 | (6) Value of Noncable Assets Other than ABIZ | $ 90,880,000 | $ 90,880,000 | $ 90,880,000 | $ 90,880,000 | $ 90,880,000 | $ 90,880,000 |
| 9 | **Adjusted TEV (*i.e.*, Assets)** | $ 2,845,134,000 | $ 6,748,443,000 | $ 6,745,150,000 | $ 6,746,796,500 | $ 5,725,244,000 | $ 5,721,951,000 |
| 10 | **Subtract Net Debt (*i.e.*, Liabilities):** | [C] $ 3,872,452,000 | $ 3,122,285,000 | $ 3,122,285,000 | [4] $ 3,006,343,000 | [i] $ 3,228,343,000 | [ii] $ 3,228,343,000 |
| 11 | **Extent to Which Solvent or Insolvent (Parenthesis Indicates Insolvent)** | **$ (1,027,318,000)** | **$ 3,626,158,000** | **$ 3,622,865,000** | **$ 3,740,453,500** | **$ 2,496,901,000** | **$ 2,493,608,000** |
| 12 | **Market Cap [D]** | $ 3,141,992,000 | $ 3,141,992,000 | $ 3,141,992,000 | $ 3,141,992,000 | $ 3,141,992,000 | $ 3,141,992,000 |
| 13 | **Premium Over (Under) Market Cap ($)** | $ (4,169,310,000) | $ 484,166,000 | $ 480,873,000 | $ 598,461,500 | $ (645,091,000) | $ (648,384,000) |
| 14 | **Premium Over (Under) Market Cap (%)** | -133% | 15% | 15% | 19% | -21% | -21% |

**[A]** Shaked Decl. 34 "Summary of Adelphia Equity Valuation"; *see also* Shaked Rept. ex. 9a. In mid-January 1999, Adelphia issued stock and received $372 million in proceeds. Initially Shaked included the equity proceeds (less $150 million in additional borrowings to finance the Stock Repurchase) as a positive adjustment to TEV. Shaked Rept. ¶¶ 213–14 & exh. 9a. Shaked reversed course in his Rebuttal Report, and instead excluded the $372 million in equity proceeds (though maintaining the $150 million in debt incurred to finance the Stock Repurchase). Shaked Rebuttal Rept. ¶ 53. Shaked also was inconsistent with respect to the inclusion of $156.1 million in cash. While Tuliano always included it, Shaked initially did, but later decided to take it out. Shaked Decl. ¶ 101.

**[B]** This table shows six categories of adjustments to Starting TEV, while the Decision speaks of only five, by reason of my split conclusions with respect to one of those five, "Receivables".

**[C]** This figure does not correspond with the $3.722 billion of net debt cited by Shaked, *see* Shaked Decl. ¶¶ 100–101; Shaked Rept. ¶ 212, because I added to Shaked's $3.722 billion the $150 million in debt to finance the Stock Repurchase. *See* note [A] above. I did so for ease of comparison between Shaked's, Tuliano's and my own valuations.

**[D]** I multiplied Adelphia's 53.2 million shares outstanding by Adelphia's market price of $59.06, both as of January 28, 1999. *See* Shaked Decl. ¶ 120 & n.54.

**[1]** Tuliano Decl. exh. 1 at 2.

**[2]** Tuliano Decl. exh. 1 at 11.

**[3]** Tuliano Decl. exh. 1 at 1, 2, 11 & 13.

**[4]** Tuliano Decl. exh. 1 at 1, 13. Tuliano used the reported value of the debt, rather than the fair market value of the debt, for his valuation conclusion.

**[i]** I began with Tuliano's reported value of the net debt and added back the $222 million in equity proceeds used to pay back Rigas and Olympus debt, the amount by which Tuliano had reduced Adelphia's net debt as a result of the equity offering. *See* Shaked Decl. ¶ 102, Tuliano Decl. ¶ 111. Because I believe that sooner or later Adelphia could satisfy its obligations in accordance with the obligations' terms, I believe the reported amount of the debt is more appropriate.

**[ii]** *Id.*